**2024-1158**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

HABAS SINAI VE TIBBI GAZLAR ISTIHSAL ENDUSTRISI A.S.,

*Plaintiff-Appellant,*

v.

UNITED STATES, CLEVELAND-CLIFFS INC., STEEL DYNAMICS, INC.,

SSAB ENTERPRISES LLC,

*Defendants-Appellees.*

Appeal from The United States Court of International Trade
in Court No. 21-00527, Judge M. Miller Baker

**OPENING BRIEF OF
PLAINTIFF-APPELLANT HABAS SINAI VE TIBBI GAZLAR ISTIHSAL
ENDUSTRISI A.S.**

Jessica R. DiPietro
Leah N. Scarpelli
Matthew M. Nolan
ArentFox Schiff LLP
1717 K Street, N.W.
Washington, DC  20006
(202) 857-6000

*Counsel for Plaintiff-Appellant
Habaş Sinai ve Tibbi Gazlar Istihsal
Endüstrisi A.Ş.*

January 16, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2024-1158 |
| **Short Case Caption** | Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi v. US |
| **Filing Party/Entity** | Habas Sinai ve Tibbi Gazlar Istihsal Endustris A.S. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: __01/16/2024___

Signature:  /s/ Jessica R. DiPietro

Name:  Jessica R. DiPietro

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable       ☐     Additional pages attached

| | | |
|---|---|---|
| Diana Dimitriuc-Quaia | | |
| Nancy Aileen Noonan | | |
| John A. Gurtunca (terminated 07/12/2022) | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☑   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable       ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

I. STATEMENT OF RELATED CASES (RULE 47.5(a) AND 47.5(b)) .........1

II. STATEMENT OF JURISDICTION ..............................................1

III. STATEMENT OF THE ISSUES ...................................................2

IV. STATEMENT OF THE CASE .......................................................2

V. STATEMENT OF FACTS............................................................2

    A. The Underlying Administrative Review ...............................2

    B. The CIT's Opinion ................................................................6

VI. SUMMARY OF THE ARGUMENT ...........................................6

VII. ARGUMENT...............................................................................7

    A. Standard Of Review ..............................................................7

    B. Commerce's Determination Is Not In Accordance With Law And Is Not Supported By Substantial Evidence .............................9

        1. The Relevant Law and Commerce's Application of the Law ..11

        2. Commerce's Prior Determinations Support Relying on the USD-Denominated Home Market Sales Prices as Reported by Habaş....................................................................................13

        3. Commerce's Questionnaires Support Relying on the Transaction Currency Reported in a Respondent's Books and Records....................................................................................18

        4. Commerce's Final Results are Not Based on Substantial Evidence and are Not in Accordance with Law ......................19

VIII. Commerce's *Final AD Results* Create Absurd Results, Inconsistent With The Record, Which Supports Relying On USD-Denominated Prices In The Home Market........................................................................25

IX. CONCLUSION AND STATEMENT OF RELIEF SOUGHT....................30

AFDOCS:199365255.6

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  802 F.3d 1339 (Fed. Cir. 2015) ....................................................................7

*Allegheny Ludlum Corp. v. United States*,
  112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ......................................25

*Am. Silicon Techs. v. United States*,
  334 F.3d 1033 (Fed. Cir. 2003) .............................................................8

*Anderson v. U.S. Sec'y of Agric.*,
  462 F. Supp. 2d 1333 (Ct. Int'l Trade 2006), *appeal dismissed*, 260
  F. App'x 266 (Fed. Cir. 2007) ...............................................................9

*Atchinson, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*,
  412 U.S. 800 (1973)................................................................................26

*Brit. Steel PLC v. United States*,
  127 F.3d 1471 (Fed. Cir. 1997) .............................................9, 10, 19

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962)................................................................................28

*Ceramark Tech., Inc. v. United States*,
  11 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ......................................24

*Changzhou Wujin Fine Chem. Factory Co. v. United States*,
  701 F.3d 1367 (Fed. Cir. 2012) .............................................................8

*Chevron, USA, Inc. v. Nat'l Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)................................................................................11

*Consol. Edison Co. of N.Y. v. NLRB*,
  305 U.S. 197 (1938)................................................................................8

*DAK Americas LLC v. United States*,
  456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ....................................10

*Dickinson v. Zurko*,
     527 U.S. 150 (1999).................................................................................9

*Eregli Demir ve Celik Fabrikalari T.A.Ş. v. United States*,
     308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) .................................13, 14

*Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*,
     No. 21-00527, 2023 WL 5985777 (Ct. Int'l Trade Sept. 14, 2023).......1, 2, 6, 23

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.Ş. v. United States*,
     498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) .......................................10

*M.M.&P. Mar. Advancement, Training, Educ. & Safety Program v. Dep't of Com.*,
     729 F.2d 748 (Fed. Cir. 1984) ...............................................................9

*Meridian Prods., LLC v. United States*,
     851 F.3d 1375 (Fed. Cir. 2017) .............................................................7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
     463 U.S. 29 (1983)..................................................................................8

*Nakornthai Strip Mill Pub. Co. v. United States*,
     587 F. Supp. 2d 1303 (Ct. Int'l Trade 2008) .................................10, 19

*Nan Ya Plastics Corp. v. United States*,
     810 F.3d 1333 (Fed. Cir. 2016) .............................................................7

*NTN Bearing Corp. v. United States*,
     74 F.3d 1204 (Fed. Cir. 1995) .............................................................11

*Nucor Corp. v. United States*,
     675 F. Supp. 2d 1340 (Ct. Int'l Trade 2008) .....................................28

*In re NuVasive, Inc.*,
     842 F.3d 1376 (Fed. Cir. 2016) .............................................................9

*SKF USA Inc. v. United States*,
     263 F.3d 1369 (Fed. Cir. 2001) ...........................................................10

*Skidmore v. Swift & Co.*,
     323 U.S. 134 (1944)..............................................................................10

iii

*SunEdison, Inc. v. United States*,
   179 F. Supp. 3d 1309 (Ct. Int'l Trade 2016) ...................................9, 19

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951)........................................................................8

*Viraj Grp. v. United States*,
   476 F.3d 1349 (Fed. Cir. 2007) .........................................................8

*Wheatland Tube Co. v. United States*,
   161 F.3d 1365 (Fed. Cir. 1998) .......................................................10

## Federal Statutes

19 U.S.C. § 1516a(b)(1)(B)(i).............................................................7, 9

19 U.S.C. § 1677b(a) .........................................................................11

19 U.S.C. § 1677b(a)(1)(B)(i).............................................................11

19 U.S.C. § 1677b(f)(1)(A).................................................................18

19 U.S.C. § 1862.................................................................................29

28 U.S.C. § 1295(a)(5)........................................................................1

28 U.S.C. § 1581(c) .............................................................................1

## Regulations

*Certain Cold-Rolled Carbon Steel Flat Products From Turkey*, 67
   Fed. Reg. 62126 (Dep't Commerce Oct. 3, 2002) (final LTFV
   determ.), and accompanying Issues and Decision Memorandum ....16, 17, 20, 25

*Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*,
   86 Fed. Reg. 11227 (Dep't Commerce Feb. 24, 2021) (prelim. AD
   results & no shipments determ.; 2018-2019), and accompanying
   Preliminary Decision Memorandum...............................................4, 5

*Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*,
   86 Fed. Reg. 47058 (Dep't Commerce Aug. 23, 2021) (final AD
   results & no shipments determ.; 2018-2019), and accompanying
   Issues and Decision Memorandum...........................................*passim.*

iv

*Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*,
84 Fed. Reg. 30694 (Dep't Commerce June 27, 2019) (final AD
results & no shipments determ.; 2016-2017), and accompanying
Issues and Decision Memorandum.............................................................*passim.*

*Certain Hot-Rolled Steel Flat Products From Republic of Turkey*, 84
Fed. Reg. 68878 (Dep't Commerce Dec. 17, 2019) (prelim. AD
results & no shipments determ.; 2017-2018), and accompanying
Preliminary Decision Memorandum......................................................15, 16, 28

*Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*,
85 Fed. Reg. 63098 (Dep't Commerce Oct. 6, 2020) (final AD
results & no shipments determ.; 2017-2018)................................................15, 29

**Other Authorities**

Import Administration Policy Bulletin 98.2: *Imputed credit expenses
and interest rates* (Feb. 23, 1998), *available at*
https://enforcement.trade.gov/policy/bull98-2.htm .............................................12

*Proclamation 9705 of March 8, 2018, Adjusting Imports of Steel Into
the United States*, 83 Fed. Reg. 11625 (Mar. 15, 2018) .....................................29

*Proclamation 9772 of August 10, 2018, Adjusting Steel Imports Into
the United States*, 83 Fed. Reg. 40429 (Aug. 15, 2018) .....................................29

AFDOCS:199365255.6

## I.     STATEMENT OF RELATED CASES (RULE 47.5(a) AND 47.5(b))

Pursuant to Federal Circuit Rule 47.5, counsel for Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. ("Habaş") makes the following statements.  First, counsel is unaware of any other appeal in or from the same civil action in the U.S. Court of International Trade ("CIT") that was previously before this Court or any other appellate court. Second, counsel for Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. is unaware of any case to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

## II.     STATEMENT OF JURISDICTION

Pursuant to 28 U.S.C. § 1295(a)(5), this Court possesses subject matter jurisdiction over the appeal from the final judgment of the U.S. Court of International Trade ("CIT") entered on September 14, 2023. *Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, No. 21-00527, 2023 WL 5985777 (Ct. Int'l Trade Sept. 14, 2023) ("*Habaş*") Appx00014-000018 and Slip. Op. 23-133, Appx00001-000013.[1]  The CIT had exclusive jurisdiction over Habaş' complaint under 28 U.S.C. § 1581(c).

On November 13, 2023, Plaintiff-Appellant Habaş timely filed a notice of appeal.

---

[1] "Appx__" refers to a page of the parties' Joint Appendix.

AFDOCS:199365255.6

## III.    STATEMENT OF THE ISSUES

Was the U.S. Department of Commerce's ("Commerce") determination to rely on the Turkish Lira ("TL") value of Habaş's home market (or "HM") sales, rather than the reported U.S. Dollar ("USD") value inconsistent with Commerce's precedent and substantial evidence on the record, which demonstrates that the USD amounts control the ultimate amount the purchaser pays for the sale?

## IV.    STATEMENT OF THE CASE

Plaintiff-Appellant Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. appeals the CIT's judgment sustaining "Commerce's decision to rely on the lira values of its home-market sales rather than the reported dollar values." *Habaş,* 2023 WL 5985777, at *2, Appx000016.

## V.    STATEMENT OF FACTS

### A.    The Underlying Administrative Review

Habaş was selected as a mandatory respondent in Commerce's review and, accordingly, timely submitted its questionnaire responses throughout the proceeding. Between June 29, 2020, and July 12, 2020, Habaş submitted its responses to Commerce's sections A-C questionnaires.  Habaş provided information to support that its HM sales were all quoted and agreed upon in USD, rather than the home market currency of TL, and that its reported HM sales reconcile with its accounting systems. *See* Habaş Section A Questionnaire Response (June 29, 2020), Appx001284-001287, Appx001323-001360 ("Sec. A

2

QR"); Habaş Section B-C Questionnaire Response (July 13, 2020), Appx01612-001632, Appx001697-001740 ("Sec. B-C QR"). Specifically, Habaş demonstrated that the customer's order is made in U.S. Dollars, the sales confirmation is entirely in U.S. Dollars, the invoice includes the U.S. Dollar exchange rate demonstrating the agreed-upon U.S.-Dollar amount, and that the customer's payment is made in dollars. *See* Habaş Case Brief at 3-4 (Mar. 26, 2021), Appx003061-003062 ("Habaş Case Br."); Sec. A QR at Exh. A-8, Appx001350-001360. On January 7, 2021, Habaş submitted its response to Commerce's questionnaire requesting supplemental information with respect to the Sections A-C questionnaires, confirming again that "all HM sales were in U.S. dollars." Habaş Supplemental Sections A-C Questionnaire Response at 5 (Jan. 7, 2021), Appx001898 ("Sec. A-C SQR").  In that questionnaire, Commerce requested additional support to reconcile home market sales and that Habaş "provide payment documentation for" a specific "home market invoice{}."   Sec. A-C SQR at 3, Appx0001896.[2] Habaş responded fully, providing "the supporting sources from its SAP system." *Id.*  Habaş also provided a "detailed reconciliation of subject merchandise reported in domestic sales to the monthly financial statements." *Id.* at 2, Appx001895. Commerce did not request additional information from Habaş.

---

[2] Cited questions are found in the Public Appendix.  We note that Commerce's questions in the Confidential Appendix are inadvertently jumbled.

AFDOCS:199365255.6

Habaş demonstrated through its questionnaire responses and written

argument that prices are quoted and agreed to in U.S. Dollars and that its invoice

value is only reported in TL to conform to Turkish VAT regulations. *See* Habaş

Case Br. at 10-20, Appx003068-003078. Habaş also provided supporting

information to the record demonstrating the vast exchange rate fluctuations

endemic with the Turkish currency. *See id.* at 11-16, Appx003069-003074, (citing

Habaş's home market sales database, provided in Sec. B-C QR at Exh. B-2,

Appx001699-001711); *see also* Sec. A-C SQR at Exh. S2-4.3 (revising the home

market sales listing), Appx002045-002057; *id.* at 3 and Exh. S2-5, Appx001896,

Appx002058-002059 (providing supporting calculations, including "all

information of the expense documents related to the sales of the subject

merchandise are shown in terms of date, TL Amount, Amount in Original

Currency, Vendor Name, and Reported Amount in the exhibits." *Id.* at 2,

Appx001896).

On February 24, 2021, the Department issued its preliminary results in

which it assigned Habaş a weighted average dumping margin of 21.48 percent.

*Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*, 86 Fed. Reg.

11227, 11228 (Dep't Commerce Feb. 24, 2021) (prelim. AD results & no

shipments determ.; 2018-2019) ("*Preliminary Results*"), Appx003049 and

accompanying Preliminary Decision Memorandum ("*Preliminary Results Memo*"),

Appx003011-003029. In the *Preliminary Results Memo*, Commerce deviated from

its practice and relied on the TL value of home market sales, rather than the USD

value. Commerce stated that it relied on TL sales values because these were "the

only sale values that can be directly tied to the audited financial records." *Id.* at 14,

Appx003024.

On August 23, 2021, the Department published its *Final AD Results*,

assigning Habaş a weighted-average dumping margin of 24.32 percent. *Certain*

*Hot-Rolled Steel Flat Products From the Republic of Turkey*, 86 Fed. Reg. 47058,

47059 (Dep't Commerce Aug. 23, 2021) (final AD results & no shipments determ.;

2018-2019 ("*Final AD Results*"), Appx000047, and accompanying Issues and

Decision Memorandum, ("*Final Results IDM*"), Appx000033-00045. In the *Final*

*AD Results*, Commerce continued to use TL-denominated sales price for Habaş's

HM sales. *See Final Results IDM* at 8-9, Appx00040-000041. In a break from prior

cases, Commerce stated that use of the TL-denominated price was appropriate

because it "use{s} the sales value that can be reconciled to the company's audited

financial statements." *Id.* at 9, Appx000041.

Disagreeing with Commerce's *Final AD Results*, Habaş filed an appeal at

the CIT.

AFDOCS:199365255.6

**B.    The CIT's Opinion**

The CIT found that "Habaş duly answered the Department's various questionnaires." *See Habaş*, 2023 WL 5985777, at *1, Appx000015. Those questionnaire responses provided "home-market sales data in both U.S. dollars and lira" and "that customers' orders were made and confirmed in dollars." *Id.* The CIT found that "the company contends that the same evidence shows that the customers paid in dollars as well." *Id.* The CIT also recognized that Habaş "provided audited financial statements in Turkish lira." *Id.* The CIT held that "{s}ubstantial evidence supports Commerce's valuation of Habaş's home-market sales in lira." *Id.* at *4, Appx000017. The CIT also held that "no unnecessary currency conversion occurred." *Id.*

## VI.    SUMMARY OF THE ARGUMENT

Commerce's determination to rely on the TL value of Habaş's HM sales, rather than the reported USD value is inconsistent with Commerce's precedent and substantial evidence on the record. In its home market sales database, Habaş reported the gross unit price in U.S. Dollars and Turkish Lira. In the Turkish market, Turkish producers, including Habaş, rely on the USD-denominated price to avoid large fluctuations in the exchange rate. Thus, customers expect to see a USD-denominated price. Habaş relied on this "transaction currency" when responding to Commerce's questionnaires. The factual record supports that home

6

market sales were made and confirmed with a USD value; invoices were issued in Turkish Lira in accordance with Turkish law, with the U.S. Dollar exchange rate specified; and customers made their payments in U.S. Dollars. Thus, Commerce should have relied on the reported USD values. Commerce's reliance on a TL value introduces distortions to the normal value calculation. The CIT similarly erred in failing to account for record evidence which supports relying on the home market USD amounts, and for allowing a deviation from Commerce's practice in affirming Commerce's decision.

## VII.  ARGUMENT

### A.    Standard Of Review

This Court applies the same standard as the CIT, upholding Commerce determinations that are supported by substantial evidence on the record and otherwise in accordance with the law. 19 U.S.C. §1516a(b)(1)(B)(i); *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016). Although this Court "give{s} due respect to the {CIT's} informed opinion," *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (internal quotation marks and citations omitted) (second alteration in original), it reviews Commerce's determinations "*de novo*." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015).

AFDOCS:199365255.6

Because this Court's review is done "without affording any deference to the Court of International Trade, . . . this court must review the entire record for substantial evidence and compliance with law." *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1036 (Fed. Cir. 2003) (citation and internal quotation marks omitted). Therefore, this Court "must reverse a determination that is unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Viraj Grp. v. United States*, 476 F.3d 1349, 1354 (Fed. Cir. 2007) (citation and internal quotation marks omitted).

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). Commerce must "take{ } into account contradictory evidence or evidence from which conflicting inferences could be drawn . . . ." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951). To support its determination with substantial evidence and comport with applicable law, Commerce must provide a reasoned explanation for its choices. *See Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (discussing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 48-49 (1983)). To provide a reasoned explanation, Commerce must "make the necessary findings and have an adequate evidentiary basis for its findings," and "examine the relevant data and articulate a satisfactory

8

explanation for its action including a rational connection between the facts found

and the choice made." *In re NuVasive, Inc.,* 842 F.3d 1376, 1382 (Fed. Cir. 2016)

(internal quotation marks and citations omitted); *see* 19 U.S.C. § 1516a(b)(1)(B)(i).

While respecting agency expertise, the Supreme Court "has stressed the

importance of not simply rubber-stamping agency factfinding." *Dickinson v.

Zurko*, 527 U.S. 150, 162 (1999).

### B.    Commerce's Determination Is Not In Accordance With Law And Is Not Supported By Substantial Evidence

"Agencies have a responsibility to administer their statutorily accorded

powers fairly and rationally." *Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d

1333, 1339 (Ct. Int'l Trade 2006), *appeal dismissed*, 260 F. App'x 266 (Fed. Cir.

2007); *see also SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309, 1316 (Ct.

Int'l Trade 2016) ("An agency determination that is arbitrary is *ipso facto*

unreasonable, and a determination is arbitrary when it fails to consider an

important aspect of the problem *or treats similar situations in dissimilar ways*.")

(internal quotations omitted) (alterations omitted) (second emphasis added)

(footnote omitted).  In other words, "{a}n agency is obligated to follow precedent,

and if it chooses to change, it must explain why."  *Brit. Steel PLC v. United States*,

127 F.3d 1471, 1475 (Fed. Cir. 1997) (quoting *M.M.&P. Mar. Advancement,

Training, Educ. & Safety Program v. Dep't of Com.*, 729 F.2d 748, 755 (Fed. Cir.

1984)).

9

Where Commerce makes a determination different from its past

determinations based on similar facts, Commerce must provide an explanation for

such a departure. *See Nakornthai Strip Mill Pub. Co. v. United States*, 587

F. Supp. 2d 1303, 1308 (Ct. Int'l Trade 2008) ("Accordingly, when departing from

its own precedent, Commerce must explain its departure."); *Brit. Steel*, 127 F.3d at

1475 (Fed. Cir. 1997). Although Commerce's "conclusions from earlier segments"

may not "serve as precedent controlling" future conclusions with respect to the

same antidumping or countervailing duty order, "courts 'look for a reasoned

analysis or explanation' from Commerce to ensure that the agency has not abused

its discretion in departing from prior analysis." *Içdaş Celik Enerji Tersane ve*

*Ulasim Sanayi A.Ş. v. United States*, 498 F. Supp. 3d 1345, 1365 (Ct. Int'l Trade

2021) (quoting *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70

(Fed. Cir. 1998)) "{A}n agency action is arbitrary when the agency offer{s}

insufficient reasons for treating similar situations differently." *SKF USA Inc. v.*

*United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (second alteration in original)

(citation omitted). "{C}onsistency has long been a core interest of administrative

law, and inconsistent treatment is inherently significant." *DAK Americas LLC v.*

*United States*, 456 F. Supp. 3d 1340, 1355 (Ct. Int'l Trade 2020) (citing *Skidmore*

*v. Swift & Co.*, 323 U.S. 134, 140 (1944).

10

### 1.    The Relevant Law and Commerce's Application of the Law

Commerce determines whether the subject merchandise is being sold at less than fair value by conducting a "fair comparison" between the export price and normal value. *See* 19 U.S.C. § 1677b(a). To calculate normal value, Commerce will consider the

> price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price{.}

19 U.S.C. § 1677b(a)(1)(B)(i). Commerce has a statutory obligation to "determine dumping margins as accurately as possible" and the impacted "U.S. industry is not entitled to a remedy in excess of the difference between foreign market value and U.S. price." *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (internal quotations and citations omitted). Where the "statute is silent," Commerce's interpretation must be reasonable. *See Chevron, USA, Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). Here, Commerce's interpretation of the statute is inconsistent with its prior determinations and is unreasonable as it is unsupported by the record evidence.

"Transaction currency" is not defined by the statute or Commerce's regulations. In a different but analogous scenario, Commerce has more fully explained "transaction currency" or the "currency of the transaction." *See, e.g.,*

AFDOCS:199365255.6

Carlo G. Cavagna, Import Administration Policy Bulletin 98.2: *Imputed credit expenses and interest rates* (Feb. 23, 1998), *available at* https://enforcement.trade.gov/policy/bull98-2.htm (explaining that "{f}or the purposes of calculating imputed credit expenses, {Commerce} will use a short-term interest rate *tied to the currency in which the sales are denominated.* {Commerce} will base this interest rate on the respondent's weighted-average short-term borrowing experience *in the currency of the transaction*." (emphasis added)). Commerce conducts an analysis of imputed credit expenses as part of its normal value calculation, the very same overarching normal value calculation Commerce is conducting in this case, analyzing the price of sales in the home market, *i.e.*, Turkey. *Id.* (Commerce may "make{} a circumstance of sale adjustment to normal value (NV) to account for differences in credit terms." *Id.*). Again, Commerce's stated practice is to rely upon the currency in which a sale was earned or incurred, or the currency of the transaction. Here, that currency is the U.S. Dollar.

Commerce's longstanding practice is to use the currency of a respondent's sale prices based on the currency which controls the ultimate amount a purchaser pays for the sale. "Commerce's normal policy, as reflected in the questionnaire instructions . . . is that 'the *sale price*, discounts, rebates and all other revenues and expenses' must be reported 'in the currencies in which they were earned or

AFDOCS:199365255.6

incurred.'" *Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*,

84 Fed. Reg. 30694 (Dep't Commerce June 27, 2019) (final AD results & no

shipments determ.; 2016-2017) ("*2016-17 HRS Final Results*"), and accompanying

Issues and Decision Memorandum at 9 ("*2016-17 HRS Final IDM*"). Commerce

has explained that it will use the USD-denominated home market sale prices, as

reported, when and because the USD price controls the ultimate amount paid by its

home market customers.  Commerce has emphasized two issues for consideration:

> (1) the price for these transactions is fixed in USD at the time of
> invoicing (*i.e.*, at the date of sale); and (2) this USD price controls the
> ultimate amount that the purchaser pays for the sale, {Commerce has}
> used the USD dollar price in {its} analysis.

*2016-17 HRS Final IDM* at 10.  Commerce has not explained why this standard

does not apply in the current case.  Here, Commerce's failure to rely on the USD

value for home market sales – the currency in which the transactional aspects of

the sale occurred – creates a great distortion of the margin.

### 2. Commerce's Prior Determinations Support Relying on the USD-Denominated Home Market Sales Prices as Reported by Habaş

In the investigation of HRS from Turkey, one of the respondents (Erdemir)

reported as part of its sales process that "{t}he unit price is stated (in USD/ton) on

the pro forma invoice, deviations from which are not permitted." *Eregli Demir ve

Celik Fabrikalari T.A.Ş. v. United States*, 308 F. Supp. 3d 1297, 1308 (Ct. Int'l

Trade 2018). Commerce accepted this reporting and, silent on the calculation,

13

relied on the USD-denominated prices. Erdemir further explained, and Commerce again accepted, that "{t}he final payable amount constitutes the unit price from the pro forma invoice, multiplied by the actual tonnage, plus value added tax." *Id.* In that case, the CIT held that "Commerce's determination to conduct its analysis in the currency in which {the second respondent} keeps its books" was reasonable. *Id.* at 1322.

In the *2016-17 HRS Final Results*, the respondent reported negotiating "the prices for the HM sales in question in USD, and these prices did not change once an agreement was reached." *2016-17 HRS Final IDM* at 9. In that case, the "buyer paid the TL equivalent amount of the USD price at the time of payment," but the respondent "did not set prices in TL. Instead, {the respondent} set prices in USD." *Id.* Therefore, in that case, Commerce determined that converting the

> USD amount to TL at the payment date of the Turkish sale (*i.e.*, what is paid by the HM customer) and then to convert this TL amount back to USD at the date of the U.S. sale would necessarily distort the HM sale prices denominated in USD, as they are included in normal value.

*Id.* Commerce reiterated its reasoning for relying on the USD price, consistent with its practice to analyze whether the price was "fixed in USD at the time of invoicing" and "this USD price controls the ultimate amount that the purchaser pays for the sale." *Id.* at 10. Commerce thus relied on USD. *Id.*

In the second administrative review of HRS from Turkey, reviewing the 2017-2018 period, Commerce again "used the gross unit prices in the currency

14

(*e.g.*, TL or USD) in which the sale was originally denominated, and subsequently reported by Colakoglu in its home market sales data, for the preliminary home market sales analysis." *Certain Hot-Rolled Steel Flat Products From Republic of Turkey*, 84 Fed. Reg. 68878 (Dep't Commerce Dec. 17, 2019) (prelim. AD results & no shipments determ.; 2017-2018), and accompanying Preliminary Decision Memorandum at 15 ("*2017-18 HRS PDM*"); *see also, Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*, 85 Fed. Reg. 63098 (Dep't Commerce Oct. 6, 2020) (final AD results & no shipments determ.; 2017-2018) ("*2017-18 HRS Review*"). Although Commerce did not issue a final results Issues and Decision Memorandum with respect to Colakoglu in this *2017-18 HRS Review*, Commerce's preliminary results contain an analysis consistent with the first administrative review. *Id.* at 63099.

In that review, Commerce reviewed commercial activities virtually identical to Habaş's commercial activities and came to a different decision than in the instant review. To summarize, below we provide a comparison of Habaş's commercial practice to Colakoglu's in the second administrative review of *HRS from Turkey* (purely to provide the most recent data):

|  | **Habaş** | **Colakoglu** |
|---|---|---|
| Order Currency | USD | USD |
| Order Confirmation Currency | USD | USD |

AFDOCS:199365255.6

|  | **Habaş** | **Colakoglu** |
|---|---|---|
| Invoice | TL, with USD foreign exchange ("forex") rate | TL and USD |
| Customer's Payment Currency | USD | USD |

*See* Sec. A QR at Exh. A-8, Appx001350-001360; Sec. B-C QR at 24, Appx001631; *2017-18 HRS PDM* at 15 (providing details for Colakoglu).

Commerce also analyzed a nearly identical scenario in the less-than-fair-value investigation of *Cold-Rolled Carbon Steel Flat Products from Turkey*. In that case, the respondent explained it "negotiated many home market sales in USD, indexed to the USD sales value" and that "it issued an invoice to obtain from the customer the exchange rate differences, . . . resulting from drastic currency fluctuation in the exchange rate from the date of invoice to the date of payment, deriving the amount in Turkish lira (TL) originally agreed upon for the sale." *Certain Cold-Rolled Carbon Steel Flat Products From Turkey*, 67 Fed. Reg. 62126 (Dep't Commerce Oct. 3, 2002) (final LTFV determ.) ("*Cold-Rolled Steel Flat Products from Turkey*"), and accompanying Issues and Decision Memorandum at 2 ("*Cold-Rolled Steel Flat Products IDM*"). Commerce agreed with the respondent and used "its USD prices instead of TL prices." *Id.* at 4.

16

In that case, Commerce and the respondent specifically reference the "kur farki" or the "exchange rate differences" as an important factor in the analysis of whether to use USD as the transaction currency.  Indeed, Commerce explained:

> When a sale is priced in USD, {respondent} has assured itself that it will receive an amount of TL based upon the exchange rate in effect at the time of invoicing. . . . Therefore, because: 1) the price for these transactions is fixed in USD at the time of invoicing; 2) this price does not change, with a few extraordinary exceptions, prior to payment; 3) the POI coincides with a time of high inflation and the amount invoiced in TL does not equal the USD amount of the sale as negotiated; and 4) price differences may exist for sales negotiated in USD versus those negotiated in TL, we have used in our analysis the USD price for those home market sales negotiated in USD.

*Id.* at 5.  The above factors were condensed into the analysis described in Commerce's final results in the 2016-2017 review of HRS from Turkey. *See 2016-17 HRS Final IDM* at 10.  Neither case mentions a prong of Commerce's analysis which requires a review of the respondent's financial statements to determine which currency to value home market sales.  Both cases, however, emphasize that the concerns (*i.e.* fluctuations in the value of the TL) which result in the use of USD-denominated prices in the Turkish market still exist.  *See, e.g.* Habaş Case Br. at 11-15, Appx003069-003073.

In this case, Habaş's home market sales are negotiated, confirmed, and paid in USD. *See id.* at 4, 16, Appx003062, Appx003074.  However, Commerce concluded and the CIT sustained the conclusion that "the record supports finding that the USD-denominated price shown on the invoice has no connection with the

17

ultimate payment and thus, the TL-denominated price on the invoice is the final price." *Final Results IDM* at 10-11, PR 112, Appx000042-000043. This analysis is inconsistent with Commerce's prior administrative reviews of HRS from Turkey.

### 3. Commerce's Questionnaires Support Relying on the Transaction Currency Reported in a Respondent's Books and Records

"Commerce's normal policy, as reflected in the questionnaire instructions," is that "the *sale price*, discounts, rebates and all other revenues and expenses' must be reported 'in the currencies in which they were earned or incurred{.}" *2016-2017 HRS Final IDM* at 9 (emphasis in original) (citation omitted). Like its prior reviews, Commerce's questionnaires in this case instructed Habaş to:

- Report the sale price, discounts, rebates and all other revenues and expenses in the currencies in which they were earned or incurred and net of taxes rebated or not collected when the product is exported (*e.g.*, net of value added taxes (VAT)).

Letter from T. Gilgunn to Habaş Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S., transmitting Initial Questionnaire at B-19, Appx001152 ("DOC Initial Questionnaire").

- Report the sale price, discounts, rebates and all other revenues and expenses in the currencies in which they were earned or incurred.

*Id.* at C-18, Appx001184.

In prior reviews, Commerce relied on the language in its questionnaires to support relying on the transaction currency as reported in the respondent's books and records to calculate normal value. *2016-17 HRS Final IDM* at 9; *see also* 19 U.S.C. § 1677b(f)(1)(A) ("Costs shall normally be calculated based on the records

18

of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise.").

Importantly, in a deviation from its prior determinations in its reviews of this same order, Commerce now states that "{i}f the instruction in the AD questionnaire is the reflection of using the transaction currency, then the term would have been defined." *Final Results IDM* at 9 n.47, Appx000041. In a review of the same AD order, Commerce stated that its normal "policy {is} reflected in the questionnaire instructions." *2016-17 HRS Final IDM* at 9. Commerce does not offer any reason why its standard questionnaire language reflects its normal policy in one review but not another. Commerce cannot treat similar situations in dissimilar ways and, if it does it must explain why its decision differs from its previous decisions. *See Brit. Steel,* 127 F.3d at 1475*; SunEdison,* 179 F. Supp. 3d at 1316; *Nakornthai,* 87 F. Supp. 2d at 1276-77.

### 4.    Commerce's Final Results are Not Based on Substantial Evidence and are Not in Accordance with Law

Commerce's *Final AD Results* are inconsistent with its prior determinations and are unreasonable as they are unsupported by the record evidence.  In stark contrast to the established precedent explained above, in the *Final AD Results*, Commerce stated that "the currency in which the sales are 'incurred' is not the sole

19

determining factor" and that it uses "the sales value that can be reconciled to the company's audited financial statements." *Final Results IDM* at 9, Appx000041. Although record evidence provides that the USD price controlled the ultimate amount the purchaser paid for the sales, Commerce determined that other factors led it to find that it should not use USD as the transaction currency, but, instead, to rely on TL-denominated sales prices. *Id.* at 9-12, Appx000041-000044.

In previous determinations, including investigations and orders on merchandise from Turkey, Commerce has consistently relied on USD values for home market sales when the transactional elements, including contracts, confirmations, and payments, were made in dollars between the respondent and the respondent's customers in the home market. This approach also accounts for the potential distortion of "the actual home market prices" in instances of "drastic" currency devaluation, an issue endemic to Turkey. *Cold-Rolled Steel Flat Products IDM* at 5. Habaş reasonably relied on Commerce's decisions to regularly use the USD-denominated values. Commerce's failure to apply the same analysis in this case causes a great distortion of the margin.

Habaş responded to Commerce's questionnaires in the form and manner requested, providing the necessary payment documents to demonstrate that prices are quoted in and agreed to in USD, *i.e.*, "set in U.S. dollars," and, thus, Commerce should have used USD-denominated prices. *See, e.g.,* Sec. A QR at 14,

Appx001285. In contrast to Commerce's finding that "the record supports finding that the USD-denominated price shown on the invoice has no connection with the ultimate payment," *Final Results IDM* at 10, Appx000042, Habaş showed in its sales reconciliation that its sales listings are accurate and complete, when using Turkish Lira values in its accounting system and its sales currencies as U.S. Dollars. *See* Sec. B-C QR at Exhs. B-1 - B-3 (providing reconciliation for HM sales); Exhs. C-1 - C-3 (demonstrating that USD is used for U.S. sales, which are also booked into the accounting system as TL), Appx001697-001715; Appx001728-001740.

The record demonstrates that the USD price does control the ultimate amount paid because prices were negotiated in USD, and the USD to TL price conversion was included on the invoice to the customer. Contrary to Commerce's description of the record, the invoice specific to the sample home market sale matches the amount negotiated in the e-mail confirmation and customer order, all in USD. Habaş provided an order form, e-mail confirmation for the sale, and the associated invoice. The customer order form and e-mail confirmation for the sale both identify the "Efektif fiyat" (effective price) of the merchandise. Sec. A QR at Exh. A-8, Appx001350-001360; *see also* Habaş Case Br. at 4, Appx002220. The related and only requested invoice on the record includes the "unit price usd" multiplied by the "fx rate" (foreign exchange rate) to calculate the corresponding

21

amount of Turkish Lira at the time of the invoice.  Sec. A QR at Exh. A-8, Appx001350-001360.  The USD amount provided as the "unit price" is the same on all three sales documents.  *Id.*  This unit price is the only key element for pricing. Demonstrated in the customer's order form and the customer's e-mail confirmation, the sale was negotiated in USD, and it was that USD price used to calculate the Turkish Lira price at the time of invoicing.  *Id.*, Appx001353.  The TL price was not the driver; the USD price controls the ultimate amount the customer paid for the sale. *See id.* at 14, Appx001285 ("{P}rices are quoted and agreed in U.S. dollars.").

 That Habaş must report its financial statements in Turkish Lira per Turkish law is not probative evidence determinative of the transaction price which controlled the amount for the sale.  Accordingly, Commerce's questions relate to Habaş's "sales process," not its accounting practice, which conforms with Turkish law. *Id.* at 13-14, Appx001284-001285.  The record shows that the customer expected a price in the amount of the USD value quoted in the invoice. The payment amount provided in the sample invoice was controlled by the USD-value appearing on the invoice, not the TL amount, as it was the same USD amount as that provided in customer communications, and the amount recorded in the supporting evidence for "payment" provided by Habaş is obviously in USD. *Id.* at Exh. A-8, Appx001350-001360.

22

Commerce claims that it is "notable" that "Habas tied the TL sales value to its audited financial records in its {home market} sales reconciliation." *Final Results IDM* at 8, Appx000040. The CIT agreed with Commerce's explanation. *See Habaş*, 2023 WL 5985777, at *4, Appx000017. This fact is not notable. Habaş explained that in order to comply with Turkish law, all transactions must be eventually converted to TL. Thus, its audited financial statements are necessarily in Turkish Lira because Habaş is a Turkish company operating in Turkey, under Turkish laws requiring reporting to be done in Turkish Lira. *See* Sec. A QR at Exh. A-10, Appx001374-001461. This does not mean that the transaction was in TL. Habaş also provided that it reported the "gross unit prices in US dollars . . . in accordance with the currency in which Habaş and its customers agree when sales are booked." Sec. B-C QR at 24, Appx001631. Also on the record are the "line-item total values in the transaction currency, *i.e.*, USD." *Id.* Finally, Habaş reported "the Turkish lira (TL) line-item values that are booked into the accounting system since all accounting entries must be made in TL, regardless of the transaction currency." *Id.* at 25, Appx001632. Thus, that the TL sales values reconcile necessarily indicates that the dollar prices also reconcile because the TL values are derived from the USD amounts on the invoices.

Although Habaş has reported that it is unable to "report the date of the receipt of payment on a transaction-specific basis because its information does not

AFDOCS:199365255.6

link payments to invoices," the payment screenshot provided by Habaş clearly

demonstrates that the amount is recorded in USD. Habaş notes that it must report

this way (one payment sample) because it works with customers based on an open

account, where payments are continuous and do not match to individual invoice

amounts. *See id.* at 21, Appx001628; Sec. A QR at Exh. A-8, Appx001350-

001360 (providing the "amount" in USD); *id.* at 14, Appx001285 (explaining that

"{p}urchase orders may correspond to a single invoice or more.").

In short, it is not Habaş's audited financial statements which show the price

controlling the ultimate amount the purchaser pays for the sale or the price fixed at

the time of invoicing. Here, the communications with the customer and the invoice

demonstrate the controlling price.

Commerce has not relied on Habaş's records which demonstrate that its

"HM sale prices are: (1) negotiated and ordered in USD, (2) invoiced in TL in

accordance with Turkish VAT regulations {with the USD exchange rate identified

in the text field on the face of the invoice}; and (3) paid in USD." *Final Results

IDM* at 8 (footnotes omitted), Appx00040; *see also* Sec. A QR at 14, Appx001285

("{P}rices are quoted and agreed in U.S. dollars."); *id.* at Exh. A-8, Appx001350-

001360. The CIT focused on Habaş's audited financial statements but, like

Commerce, improperly dismissed factual evidence on the record supporting the use

of the reported USD amounts. *See Ceramark Tech., Inc. v. United States*, 11 F.

Supp. 3d 1317, 1323 (Ct. Int'l Trade 2014) (citing *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000)) (requiring that Commerce consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion).

## VIII.  COMMERCE'S *FINAL AD RESULTS* CREATE ABSURD RESULTS WHICH ARE INCONSISTENT WITH THE RECORD

In this case, Commerce found that "an inflation rate of at least 25% existed during the comparison period based on the Turkish producer price index." Memorandum from L. Wang to The File, re: Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. (Habas) Preliminary Margin Calculation Memorandum at 2 (Feb. 17, 2021) ("Prelim. Margin Calc. Memo"), Appx003031.  To combat the volatile exchange rate, USD-denominated prices for sales in the home market are used.

> Prices negotiated in USD and prices negotiated in TL may be fixed differently, and if the prices are fixed differently for those who pay in USD versus TL, then the USD prices for sales negotiated in USD should be used to ensure capturing the real value for those sales.

*Cold-Rolled Steel Flat Products IDM* at 5.  The record shows that Habaş negotiates USD prices with its customers and that its customers pay in USD.  *See* Sec. A QR at Exh. A-8, Appx001360 (providing evidence of customer payment, which demonstrates payment was made in USD).  As described above, historically, Commerce has considered such evidence as support enough to rely on the USD-denominated prices in Commerce's home market analysis.

AFDOCS:199365255.6

Here, Commerce's rationale is that the use of TL unit values is required because, in part, "the information on the record supports finding that the USD-denominated price shown on the invoice has no connection with the ultimate payment and thus, the TL-denominated price on the invoice is the final price. Notably, Habaş reported no price adjustments related to currency conversions." *Final Results IDM* at 10-11, Appx000042-000043. This is not the analysis used in previous reviews, nor does Commerce provide support that it only considers the connection between the prices on the invoice and the ultimate payment. *See id.* at 9-11, Appx000041-000043 (citing to Commerce's questionnaire and to *Eregli Demir*). First, Commerce cites to its questionnaire to support its "practice . . . to use the sales value that can be reconciled to the company's audited financial statements." *Id.* at 9 and n.48, Appx000041. This decision is in direct contradiction to Commerce's decision in the same review that it is not normal practice to use the transaction currency because it is not defined in the questionnaire. *Id.* at 9 n.47, Appx000041. Commerce is trying to use its questionnaire language to support one practice (using values that reconcile to audited financial statements) but not another (using the transaction currency as reported in the respondent's books and records), despite its prior determinations which allow for the use of the transaction currency. Commerce must, at the very least, explain this discrepancy. *See Atchinson, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808

26

(1973) (the agency has a "duty to explain its departure from prior norms."). Second, as explained above, *Eregli Demir* requires that Commerce look to the respondent's books and records. Here, Habaş's records demonstrate that Commerce should rely on the USD-denominated sales as reported.

Specifically, Habaş provided sales documentation demonstrating that its customer's order is made in dollars. *See* Sec. A QR at Exh. A-8, Appx001350-001360. The home market sample sales demonstrate that the base price ("baz fiyat"), the extras ("Ekstralar"), and the effective price ("Efektif fiyat") are all in U.S. dollars, as are the calculated total values ("tutar"), and cost and freight (C.F.R.) destination value. *Id.* Communications with customers, confirming the sales, demonstrate that the confirmed base price, extras, effective price, and cost and freight (C.F.R.) are all in USD. *Id.* Habaş issues an electronic invoice, which shows that the invoice value is in TL, as required by Turkish VAT regulations, and the relevant unit price in USD, with the foreign exchange rate to convert from USD to TL. *Id.* The TL value is only included to ensure compliance with Turkish Law. *See* Habaş Case Br. at 2, Appx003060. Habaş also submitted evidence of payment; this bank payment voucher clearly shows that payments were made in USD. *See* Sec. A QR at Exh. A-8, Appx001350-001360. Commerce claims that "{s}ince the bank receipt is not from Habas's bank . . . the payment document is unlikely maintained in Habas's books and records." *Final Results IDM* at 10, Appx000042.

AFDOCS:199365255.6

Commerce's claim amounts to an assumption at best. It is a conclusion not based in the evidence on the record. *See Nucor Corp. v. United States*, 675 F. Supp. 2d 1340, 1345 (Ct. Int'l Trade 2008) ("There must be a rational connection between the facts found and the choice made.") (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Habaş responded to Commerce's questionnaire, providing customer payment information as part of its home market sample sales reporting and submitted that "payment is made in dollars." *See, e.g.,* Habaş Case Br. at 4, Appx003062.

Commerce acknowledged that Habaş's home market sales were negotiated and ordered in USD, and paid in USD." *Final Results IDM* at 8, Appx00040 (accepting Habaş's reporting). Although Habaş had to invoice its home market sales in Turkish Lira pursuant to Turkish law, it "reported the USD price, USD sales value (*i.e.*, quantity * USD price), and the TL sales value." *Id.*; *see also* Sec. B-C QR at 6, Appx001613; Sec. A-C SQR at 2, Exhs. S2-2 – S2-3, Appx001895, Appx002022-002035. This fact should not, and has not in past cases, precluded the use of USD values for Habaş's home market sales. *See, e.g. 2016-17 HRS Final IDM* at 8 (including an undisputed description from respondent that "Turkish law requires companies to report financial statements in TL and to pay value-added tax in TL" but making no mention otherwise of an analysis of the respondent's financial statements); *see also 2017-18 HRS PDM* at 15 (reporting that the USD

28

value was converted to TL "using the exchange rate" based on "the date it issued

its home market invoice."); *2017-18 HRS Review,* 85 Fed. Reg. at 63099 (making

no changes with respect to currency). In the *2016-17 HRS Final Results* case,

Commerce relied on the USD-denominated values in the home market while the

respondent's financial statements were reported in TL. *2016-17 HRS Final IDM* at

8. Habaş is not in a unique situation – all companies' audited financial statements

in Turkey must be in the national currency, Turkish Lira.

Last, relying on the TL-denominated value, converted to U.S. Dollars,

introduces an extraordinary distortion to the margin calculations because the month

of the U.S. sale, August 2018, witnessed an aberrational and unique devaluation of

the Turkish currency as a result of the U.S. government's imposition of additional

25 percent section 232 duties against Turkey, in addition to the original 232 duties

generally applicable to U.S. trading partners. *See Proclamation 9705 of March 8,*

*2018*, *Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11625 (Mar.

15, 2018) (imposing a 25 percent import duty surcharge on steel products under

section 232 of the Trade Expansion Act of 1962, as amended, 19 U.S.C. § 1862);

*Proclamation 9772 of August 10, 2018*, *Adjusting Steel Imports Into the United*

*States*, 83 Fed. Reg. 40429 (Aug. 15, 2018) (imposing an additional 25 percent

duty on steel imports from Turkey). The Section 232 duties are extraordinary

examples of an endemic risk with denominating transactions in TL: the Turkish

currency fluctuates often and widely. *See* Habaş Case Br. at 12-14, Appx003070-003072. Month-to-month in 2018, differences in the foreign exchange rates range from 2.2% to 17.6% and the percent difference changed almost every month of the year. *Id.* at 12, Appx002228; *see also* Prelim. Calc. Memo at 2, Appx003031; Habaş Case Br. at 12-14, Appx003070-003072 (reproducing foreign exchange rates provided in Commerce's data files attached to the Preliminary Margin Calculation Memorandum). The same can be seen for 2019 and 2020. *See* Habaş Case Br. at 12, Appx003070. Thus, to avoid the exchange rate fluctuation risks, Turkish producers denominate transactions in U.S. Dollars. Commerce's calculation which converts the USD-denominated price from U.S. Dollars to Turkish Lira and back again to U.S. Dollars introduces a distortion which the USD-Denominated transaction is designed to prevent in this context. Substantial evidence on the record and law support Commerce relying on the USD-denominated price *as reported* by Habaş. Relying on the USD-denominated prices represents the best information for the most accurate dumping margin.

## IX.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons set forth above, Commerce's *Final AD Results* were not in accordance with law and were not supported by substantial evidence with respect to Commerce's determination to continue to use the TL-denominated price for Habaş's home market sales.  The CIT's decision sustaining Commerce's

conclusions is similarly not supported by substantial evidence on the record and is

otherwise not in accordance with law.  Therefore, Habaş Sinai ve Tibbi Gazlar

Istihsal Endüstrisi A.Ş. requests that this Court reverse the CIT's decision on this

issue, and remand to Commerce with instructions to issue a revised determination,

consistent with the opinion of this Court.


Respectfully submitted,


**/s/ Jessica R. DiPietro**
Jessica R. DiPietro
Leah N. Scarpelli
Matthew M. Nolan
ArentFox Schiff LLP
1717 K Street, N.W.
Washington, DC  20006

(202) 857-6000

*Counsel for Habaş Sinai ve Tibbi*
*Gazlar Istihsal Endüstrisi A.Ş.*

January 16, 2024

AFDOCS:199365255.6

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1158

**Short Case Caption:** Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  7,058  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 01/16/2024

Signature:  /s/ Jessica R. DiPietro

Name:  Jessica R. DiPietro

Save for Filing

# ADDENDUM

| Document | Joint Appendix Page Numbers |
|---|---|
| *Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, No. 21-00527, slip op. 23-133 (Ct. Int'l Trade Sept. 14, 2023) | Appx000001-000013 |
| *Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, No. 21-00527, 2023 WL 5985777 (Ct. Int'l Trade Sept. 14, 2023) | Appx000014-000018 |
| 19 U.S.C. § 1677b(a)(1)(B)(i) | N/A |
| 19 U.S.C. § 1677b(f)(1)(A) | N/A |

*Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, No. 21-00527, slip op. 23-133 (Ct. Int'l Trade Sept. 14, 2023)

**Appx000001-000013**

Slip Op. 23-133

# UNITED STATES
# COURT OF INTERNATIONAL TRADE

### Court No. 21-00527

HABAŞ SINAI VE TIBBI GAZLAR
ISTIHSAL ENDÜSTRISI A.Ş.,

*Plaintiff,*

v.

UNITED STATES,

*Defendant,*

and

CLEVELAND-CLIFFS INC.;
STEEL DYNAMICS, INC.; and
SSAB ENTERPRISES LLC,

*Defendant-Intervenors.*

Before: M. Miller Baker, Judge

## OPINION

[The court denies Plaintiff's motion for judgment on the agency record and instead grants judgment to Defendant and Defendant-Intervenors.]

Dated: September 14, 2023

*Matthew M. Nolan* and *Jessica R. DiPietro*, ArentFox Schiff LLP of Washington, DC, on the briefs for Plaintiff.

Ct. No. 21-00527                                           **Page 2**

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; *Tara K. Hogan*, Assistant Director; and *Kelly A. Krystyniak*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, on the brief for Defendant. Of counsel on the brief was *Paul K. Keith*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

*Stephen P. Vaughn* and *Daniel L. Schneiderman*, King & Spalding, LLP, of Washington, DC, on the brief for Defendant-Intervenor Cleveland-Cliffs, Inc.

*Roger B. Schagrin* and *Jeffrey D. Gerrish*, Schagrin Associates of Washington, DC, on the brief for Defendant-Intervenors Steel Dynamics, Inc., and SSAB Enterprises, LLC.

    *Baker*, Judge: In this case, a Turkish manufacturer and distributor challenges the Department of Commerce's calculation of its home-market sales in an administrative review of an antidumping order applicable to steel imports from that country. For the reasons below, the court sustains Commerce's determination.

I

    To combat unfair trade practices, the Tariff Act of 1930, as amended, permits Commerce to impose antidumping duties on an importer of "foreign merchandise [that] is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673(1). This requires the Department to conduct "a fair comparison . . . between the export price or constructed

Appx000002

Ct. No. 21-00527                                         **Page 3**

export price and normal value" of the subject merchandise. *Id.* § 1677b(a). The statute defines "normal value" as "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country . . . ." *Id.* § 1677b(a)(1)(B)(i); *see also Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1334 n.6 (CIT 2020) (discussing normal value). This case concerns the calculation of normal value.

## II

In 2016, the Department issued an antidumping order covering hot-rolled steel flat products from Turkey. *See Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom*, 81 Fed. Reg. 67,962 (Dep't Commerce Oct. 3, 2016). In 2019, several domestic producers requested an administrative review of that order covering the period from October 1, 2018, through September 30, 2019. Appx001085–001088; *see Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 84 Fed. Reg. 52,068, 52,070 (Dep't Commerce Oct. 1, 2019). Commerce opened a review and selected Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi, a Turkish manufacturer and exporter of rebar, as the sole mandatory respondent. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 67,712, 67,716 (Dep't Commerce Dec. 11, 2019); *see also* Appx001096–001101.

Ct. No. 21-00527                                    **Page 4**

Habaş duly answered the Department's various
questionnaires. The company's Section A response
provided audited financial statements in Turkish lira,
*see* Appx001374–001461, and its Section B and C re-
sponses supplied home-market sales data in both U.S.
dollars and lira, *see* Appx001631–001632. Habaş also
submitted evidence that customers' orders were made
and confirmed in dollars; the company contends that
the same evidence shows that the customers paid in
dollars as well. Appx001350–001360.

In its preliminary results, Commerce found that
"Habaş reconciled its home-market sale values in
Turkish lira . . . to its audited financial records," so the
Department accordingly used "a home market unit
price denominated in [lira]." Appx001024. Based on
that price, the Department calculated a weighted-av-
erage dumping margin of 21.48 percent. Appx001049.

Habaş then argued that the preliminary results im-
properly measured its home-market sales in lira in-
stead of dollars. Appx002213–002237. The company
contended that Turkish law required it to use lira as
the accounting currency, and that the Department has
a "consistent line of precedents . . . in which Commerce
has used U.S. dollar values for home-market sales,
when the transactional elements (contracts, confirma-
tions, and payments) were made in dollars between
the respondent and its customer, even though the ac-
counting registrations of the sales were in local cur-
rency." Appx002219. The domestic producers re-
sponded that "[t]he total USD value of Habaş' home
market sales has not been reconciled to the financial
statements, and thus Commerce may not rely on those

Ct. No. 21-00527                                Page 5

USD values in the antidumping calculations."
Appx002247–002248 (emphasis and footnote refer-
ences omitted).

The Department reiterated in its final results that
it had to rely on lira "[b]ecause Habaş demonstrated
that its [home-market] sales were reported accurately
and completely in only the [lira]-denominated sales
values, but not the claimed USD sales values."
Appx001069. In response to Habaş's contention that
the Department should base normal value on dollars
because "Commerce's normal practice is to use the
'transaction currency,'" the agency explained that its
protocol is to "use the sales value that can be recon-
ciled to the company's audited financial statements."
Appx001069 (quoting Habaş case brief at 2). Using
those values based on lira, the agency calculated a fi-
nal weighted-average dumping margin for the com-
pany of 24.32 percent. Appx001079.

III

Habaş brought this suit under 19 U.S.C.
§§ 1516a(a)(2)(A)(i)(I) and 1516a(a)(2)(B)(i) challeng-
ing Commerce's final determination. ECF 10, ¶ 3. The
court has subject-matter jurisdiction over such actions
under 28 U.S.C. § 1581(c).

Three domestic steel producers intervened as de-
fendants supporting the government. *See* ECF 18
(Cleveland-Cliffs Inc.), ECF 24 (Steel Dynamics, Inc.,
and SSAB Enterprises LLC). Habaş moved for judg-
ment on the agency record. ECF 44. The government,
ECF 49, and the intervenors, ECF 43, opposed and

Ct. No. 21-00527                                    **Page 6**

Habaş replied, ECF 45 (confidential); ECF 46 (public). The court decides the motion on the papers.

In actions such as this brought under 19 U.S.C. § 1516a(a)(2), "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). That is, the question is not whether the court would have reached the same decision on the same record—rather, it is whether the administrative record as a whole permits Commerce's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up).

In addition, Commerce's exercise of discretion in § 1516a(a)(2) cases is subject to the default standard of the Administrative Procedure Act, which authorizes a reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Solar World Americas, Inc. v. United States*, 962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020) (explaining that in § 1516a cases

Ct. No. 21-00527                                    Page 7

brought under section 516A of the Tariff Act of 1930,
APA "section 706 review applies since no law provides
otherwise") (citing 28 U.S.C. § 2640(b)). "[I]t is well-
established that an agency action is arbitrary when
the agency offers insufficient reasons for treating sim-
ilar situations differently." *See SKF USA Inc. v.
United States*, 293 F.3d 1369, 1382 (Fed. Cir. 2001)
(cleaned up).

IV

Habaş challenges Commerce's decision to rely on
the lira values of its home-market sales rather than
the reported dollar values. ECF 44, at 2–3. The com-
pany asserts two theories. First, it argues that the De-
partment's determination is arbitrary and unreasona-
ble given its history of preferring the transaction cur-
rency. *Id.* at 9–23. Second, the company claims that
the valuation of its home-market sales in lira creates
a mischaracterization of the sale price that distorts the
margin. *Id.* at 23–30.

A

Habaş argues that Commerce unlawfully departed
from its "longstanding practice . . . to use the currency
of a respondent's sale prices based on the currency
which controls the ultimate amount a purchaser pays
for the sale." ECF 44, at 13.[1] The company contends

---

[1] Although its factual determinations receive deference,
*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed.
Cir. 1996), Commerce, like all agencies, must treat like sit-
uations consistently. *See SunEdison, Inc. v. United States*,
179 F. Supp. 3d 1309, 1316 (CIT 2016) ("[A]n agency

Ct. No. 21-00527                                    Page 8

that in previous antidumping reviews, the Department stated that its preference is to use the transaction currency to avoid unnecessary currency conversions. *Id.* at 13–14 (citing *Stainless Steel Plate in Coils from the Republic of Korea*, 66 Fed. Reg. 45,279, 45,280 (Dep't Commerce Aug. 28, 2001); *Certain Hot-Rolled Steel Flat Products from the Republic of Turkey*, 84 Fed. Reg. 30,694 (Dep't Commerce June 27, 2019), and accompanying I&D Memo at 10 (2016–17 HRS I&D Memo)). For example, when calculating the home-market sales of Colakoglu, another Turkish distributor of steel products, Commerce stated that it would measure the sales in dollars where "(1) the price for these transactions [was] fixed in USD at the time of invoicing (*i.e.*, at the date of sale); and (2) this USD price control[led] the ultimate amount that the purchaser pa[id] for the sale." 2016–17 HRS I&D Memo at 10.

Habaş argues that its home-market sales satisfy these criteria because they were "negotiated, confirmed, and paid in U.S. Dollars." ECF 44, at 15. The company points to e-mail communications with a customer and an invoice for a sample sale in which the ultimate price was negotiated in dollars. Appx001351–001353. Additionally, a bank statement shows that the

---

determination that is arbitrary is *ipso facto* unreasonable, and a determination is arbitrary when it . . . treats similar situations in dissimilar ways."); *see also Brit. Steel PLC v. United States*, 127 F.3d 1471, 1475 (Fed. Cir. 1997) ("An agency is obligated to follow precedent, and if it chooses to change, it must explain why.") (quoting *M.M.&P. Mar. Advancement, Training, Educ. & Safety Program v. Dep't of Com.*, 729 F.2d 748, 755 (Fed. Cir. 1984)).

company received a payment in dollars from the same customer.[2] Appx001360. Habaş insists that this information alone demonstrates that its home-market sales were transacted in dollars and therefore obligated Commerce to use the USD price in its calculations.

The Department, however, would have acted inconsistently with its precedent only if Habaş's home-market sales were negotiated in dollars *and* the dollar price ultimately controlled the amount paid. *See* 2016–17 HRS I&D Memo at 10. Although the company provided evidence that the prices were negotiated, ordered, and set in dollars on the invoice date, Commerce concluded that Habaş did not show that those prices ultimately controlled the final payment. Appx001070–001071.

When determining which currency's value controlled the transaction, Commerce's practice is to look to "the sales value that can be reconciled to the company's audited financial statements." Appx001069; *see also Stainless Steel Flanges from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 13,244 (Dep't Commerce Mar. 28, 2018) and accompanying Preliminary I&D Memo at 9. Therefore, as in previous

---

[2] Commerce explained that this bank statement is of no use because "the payment amount apparently has no connection with the USD price and quantity shown on the invoice (*i.e.*, the payment amount does not equal USD price times quantity, or to [sic] USD price times quantity plus tax)." Appx001070. The Department therefore concluded that the price shown on the document had no connection to the ultimate payment. *Id.*

Ct. No. 21-00527                                    Page 10

investigations, the Department required Habaş to "provide a reconciliation of the sales reported in [its] home market sales databases to the total sales listed in [its] financial statements." Appx001139. The company correspondingly provided audited financial statements in lira, Appx001070, which the agency reconciled with Habaş's reported sales values, Appx001068. Commerce accordingly determined that the lira values controlled the transaction.

The company argues that if the Department could reconcile the lira invoice prices with audited financial records, the dollar prices necessarily reconcile because the lira amount is "directly related to and derived from the USD amount on the invoice." ECF 46, at 12. Commerce, however, explained that Habaş "does not know the payment date of each invoice." Appx001070. Accordingly, the Department could not determine what foreign exchange rate was in effect on the date of the actual payment. *Id.*[3] Because Commerce could not assign a value in dollars to each payment received, it could not reconcile each payment with the dollar value on the corresponding invoice.

These facts distinguish this review from Colakoglu's submission in the 2016–17 administrative review. There, the Department determined that prices

---

[3] As Habaş points out, the lira experienced "an aberrational and unique devaluation" during the period of review, causing the foreign exchange rates to fluctuate by as much as 17.6 percent month-to-month throughout 2018. ECF 44, at 28–29. A large range of exchange rates therefore could have applied on each payment date.

were negotiated and invoiced in dollars and "the buyer paid the [lira] equivalent amount of the USD price *at the time of payment*." 2016–17 HRS I&D Memo at 9 (emphasis added). Unlike Habaş, therefore, Colakoglu could definitively assign foreign exchange rates to specific payments because it knew each payment date, and Commerce could confirm that Colakoglu was "paid the [lira] amount based on the USD price set on the date of sale and the exchange rate in effect at the time of payment," so the "USD amount controlled the ultimate [lira] amount paid by the [home-market] customers." *Id.*

As the Department explained here, "the currency in which the sales are 'incurred' is not the sole determining factor." Appx001069. Substantial evidence supports Commerce's valuation of Habaş's home-market sales in lira, and the company did not show that the Department acted arbitrarily.

B

Habaş further asserts that "relying on the [lira-]denominated value, converted to U.S. Dollars, introduces an extraordinary distortion to the margin calculations." ECF 44, at 28. This claim derives from Commerce's established practice that disfavors converting prices "into the [home-market] currency at the date of the [home-market] sale and then back to USD at the date of the U.S. sale." 2016–17 HRS I&D Memo at 9; *see also* 19 U.S.C. § 1677b-1(a) (obligating the Department to "convert foreign currencies into United States dollars using the exchange rate in effect on the date of sale of the subject merchandise" instead of the rate in

Ct. No. 21-00527                                     **Page 12**

effect on the date of the home-market sale). Converting a U.S. dollar price into lira at the date of the home-market sale and then back into dollars using a different exchange rate at the date of the U.S. sale would therefore distort the home-market price.

The Department, however, did not "convert[] the USD-denominated price from U.S. Dollars to Turkish Lira." ECF 44, at 29. It instead directly "relied on Habaş's reported [lira] values, which reconciled to Habaş's audited financial statements." ECF 49, at 26. Therefore, no unnecessary currency conversion occurred.

\*   \*   \*

For the foregoing reasons, the court denies Habaş's motion for judgment on the agency record and grants judgment on the agency record to the government and Defendant-Intervenors. *See* USCIT R. 56.2(b). A separate judgment will issue. *See* USCIT R. 58(a).

Dated: September 14, 2023        /s/ *M. Miller Baker*
      New York, NY             Judge

# UNITED STATES COURT OF INTERNATIONAL TRADE

HABAŞ SINAI VE TIBBI GAZLAR
ISTIHSAL ENDÜSTRISI A.Ş.,

    *Plaintiff,*

v.

UNITED STATES,

    *Defendant,*

and

CLEVELAND-CLIFFS INC.; STEEL
DYNAMICS, INC.; and SSAB
ENTERPRISES LLC,

    *Defendant-Intervenors.*

Ct. No. 21-00527

Before: M. Miller Baker, Judge

## JUDGMENT

For the reasons stated in Slip Opinion 23-133 (ECF 67), the court **DE-NIES** Plaintiff's motion for judgment on the agency record (ECF 33), **GRANTS** judgment on the agency record to Defendant and Defendant-Intervenors, and **SUSTAINS** the Department of Commerce's final determination in this matter.

Dated:    September 14, 2023    /s/ *M. Miller Baker*
           New York, New York     M. Miller Baker, Judge

*Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, No. 21-00527, 2023 WL 5985777 (Ct. Int'l Trade Sept. 14, 2023)

Appx000014-000018

⚑ KeyCite Blue Flag – Appeal Notification

Appeal Filed by  HABAŞ SINAI VE TIBBI GAZLAR ISTIHSAL ENDUSTRISI v. US,  Fed.Cir.,  November 17, 2023

2023 WL 5985777
Only the Westlaw citation is currently available.
United States Court of International Trade.

HABAŞ SINAI VE TIBBI GAZLAR
ISTIHSAL ENDÜSTRISI A.Ş., Plaintiff,

v.

UNITED STATES, Defendant,

and

Cleveland-Cliffs Inc.; Steel Dynamics, Inc.; and
SSAB Enterprises LLC, Defendant-Intervenors.

Slip Op. 23-133
|
Court No. 21-00527
|
September 14, 2023

**Attorneys and Law Firms**

Matthew M. Nolan and Jessica R. DiPietro, ArentFox Schiff LLP of Washington, DC, on the briefs for Plaintiff.

Brian M. Boynton, Principal Deputy Assistant Attorney General; Patricia M. McCarthy, Director; Tara K. Hogan, Assistant Director; and Kelly A. Krystyniak, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, on the brief for Defendant. Of counsel on the brief was Paul K. Keith, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

Stephen P. Vaughn and Daniel L. Schneiderman, King & Spalding, LLP, of Washington, DC, on the brief for Defendant-Intervenor Cleveland-Cliffs, Inc.

Roger B. Schagrin and Jeffrey D. Gerrish, Schagrin Associates of Washington, DC, on the brief for Defendant-Intervenors Steel Dynamics, Inc., and SSAB Enterprises, LLC.

**OPINION**

Baker, Judge:

**\*1**  In this case, a Turkish manufacturer and distributor challenges the Department of Commerce's calculation of its home-market sales in an administrative review of an antidumping order applicable to steel imports from that country. For the reasons below, the court sustains Commerce's determination.

I

To combat unfair trade practices, the Tariff Act of 1930, as amended, permits Commerce to impose antidumping duties on an importer of "foreign merchandise [that] is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673(1). This requires the Department to conduct "a fair comparison ... between the export price or constructed export price and normal value" of the subject merchandise. Id. § 1677b(a). The statute defines "normal value" as "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country ...." Id. § 1677b(a)(1)(B)(i); see also Hung Vuong Corp. v. United States, 483 F. Supp. 3d 1321, 1334 n.6 (CIT 2020) (discussing normal value). This case concerns the calculation of normal value.

II

In 2016, the Department issued an antidumping order covering hot-rolled steel flat products from Turkey. See Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom, 81 Fed. Reg. 67,962 (Dep't Commerce Oct. 3, 2016). In 2019, several domestic producers requested an administrative review of that order covering the period from October 1, 2018, through September 30, 2019. Appx001085-001088; see Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review, 84 Fed. Reg. 52,068, 52,070 (Dep't Commerce Oct. 1, 2019). Commerce opened a review and selected Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi, a Turkish manufacturer and exporter of rebar, as the sole mandatory respondent. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 67,712, 67,716 (Dep't Commerce Dec. 11, 2019); see also Appx001096–001101.

Habaş duly answered the Department's various questionnaires. The company's Section A response provided audited financial statements in Turkish lira, *see* Appx001374–001461, and its Section B and C responses supplied home-market sales data in both U.S. dollars and lira, *see* Appx001631–001632. Habaş also submitted evidence that customers' orders were made and confirmed in dollars; the company contends that the same evidence shows that the customers paid in dollars as well. Appx001350–001360.

In its preliminary results, Commerce found that "Habaş reconciled its home-market sale values in Turkish lira ... to its audited financial records," so the Department accordingly used "a home market unit price denominated in [lira]." Appx001024. Based on that price, the Department calculated a weighted-average dumping margin of 21.48 percent. Appx001049.

Habaş then argued that the preliminary results improperly measured its home-market sales in lira instead of dollars. Appx002213–002237. The company contended that Turkish law required it to use lira as the accounting currency, and that the Department has a "consistent line of precedents ... in which Commerce has used U.S. dollar values for home-market sales, when the transactional elements (contracts, confirmations, and payments) were made in dollars between the respondent and its customer, even though the accounting registrations of the sales were in local currency." Appx002219. The domestic producers responded that "[t]he total USD value of Habaş' home market sales has not been reconciled to the financial statements, and thus Commerce may not rely on those USD values in the antidumping calculations." Appx002247–002248 (emphasis and footnote references omitted).

**\*2**  The Department reiterated in its final results that it had to rely on lira "[b]ecause Habaş demonstrated that its [home-market] sales were reported accurately and completely in only the [lira]-denominated sales values, but not the claimed USD sales values." Appx001069. In response to Habaş's contention that the Department should base normal value on dollars because "Commerce's normal practice is to use the 'transaction currency,' " the agency explained that its protocol is to "use the sales value that can be reconciled to the company's audited financial statements." Appx001069 (quoting Habaş case brief at 2). Using those values based on lira, the agency calculated a final weighted-average dumping margin for the company of 24.32 percent. Appx001079.

### III

Habaş brought this suit under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and 1516a(a)(2)(B)(i) challenging Commerce's final determination. ECF 10, ¶ 3. The court has subject-matter jurisdiction over such actions under 28 U.S.C. § 1581(c).

Three domestic steel producers intervened as defendants supporting the government. *See* ECF 18 (Cleveland-Cliffs Inc.), ECF 24 (Steel Dynamics, Inc., and SSAB Enterprises LLC). Habaş moved for judgment on the agency record. ECF 44. The government, ECF 49, and the intervenors, ECF 43, opposed and Habaş replied, ECF 45 (confidential); ECF 46 (public). The court decides the motion on the papers.

In actions such as this brought under 19 U.S.C. § 1516a(a)(2), "[t]he court shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). That is, the question is not whether the court would have reached the same decision on the same record—rather, it is whether the administrative record as a whole permits Commerce's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up).

In addition, Commerce's exercise of discretion in § 1516a(a)(2) cases is subject to the default standard of the Administrative Procedure Act, which authorizes a reviewing court to "set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Solar World Americas, Inc. v. United States,* 962

Case: 24-1158    Document: 18    Page: 60    Filed: 01/16/2024

Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v....., Not Reported in Fed....

F.3d 1351, 1359 n.2 (Fed. Cir. 2020) (explaining that in § 1516a cases brought under section 516A of the Tariff Act of 1930, APA section 706 review applies since no law provides otherwise") (citing 28 U.S.C. § 2640(b)). "[I]t is well-established that an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *See SKF USA Inc. v. United States,* 293 F.3d 1369, 1382 (Fed. Cir. 2001) (cleaned up).

### IV

Habaş challenges Commerce's decision to rely on the lira values of its home-market sales rather than the reported dollar values. ECF 44, at 2–3. The company asserts two theories. First, it argues that the Department's determination is arbitrary and unreasonable given its history of preferring the transaction currency. *Id.* at 9–23. Second, the company claims that the valuation of its home-market sales in lira creates a mischaracterization of the sale price that distorts the margin. *Id.* at 23–30.

### A

Habaş argues that Commerce unlawfully departed from its "longstanding practice ... to use the currency of a respondent's sale prices based on the currency which controls the ultimate amount a purchaser pays for the sale." ECF 44, at 13. [1] The company contends that in previous antidumping reviews, the Department stated that its preference is to use the transaction currency to avoid unnecessary currency conversions. *Id.* at 13–14 (citing *Stainless Steel Plate in Coils from the Republic of Korea,* 66 Fed. Reg. 45,279, 45,280 (Dep't Commerce Aug. 28, 2001); *Certain Hot-Rolled Steel Flat Products from the Republic of Turkey,* 84 Fed. Reg. 30,694 (Dep't Commerce June 27, 2019), and accompanying I&D Memo at 10 (2016–17 HRS I&D Memo)). For example, when calculating the home-market sales of Colakoglu, another Turkish distributor of steel products, Commerce stated that it would measure the sales in dollars where "(1) the price for these transactions [was] fixed in USD at the time of invoicing (*i.e.,* at the date of sale); and (2) this USD price control[led] the ultimate amount that the purchaser pa[id] for the sale." 2016–17 HRS I&D Memo at 10.

[1]    Although its factual determinations receive deference, *Fujitsu Gen. Ltd. v. United States,* 88

F.3d 1034, 1039 (Fed. Cir. 1996), Commerce, like all agencies, must treat like situations consistently. *See SunEdison, Inc. v. United States,* 179 F. Supp. 3d 1309, 1316 (CIT 2016) ("[A]n agency determination that is arbitrary is *ipso facto* unreasonable, and a determination is arbitrary when it ... treats similar situations in dissimilar ways."); *see also Brit. Steel PLC v. United States,* 127 F.3d 1471, 1475 (Fed. Cir. 1997) ("An agency is obligated to follow precedent, and if it chooses to change, it must explain why.") (quoting *M.M.&P. Mar. Advancement, Training, Educ. & Safety Program v. Dep't of Com.,* 729 F.2d 748, 755 (Fed. Cir. 1984)).

**\*3** Habaş argues that its home-market sales satisfy these criteria because they were "negotiated, confirmed, and paid in U.S. Dollars." ECF 44, at 15. The company points to e-mail communications with a customer and an invoice for a sample sale in which the ultimate price was negotiated in dollars. Appx001351–001353. Additionally, a bank statement shows that the company received a payment in dollars from the same customer. [2] Appx001360. Habaş insists that this information alone demonstrates that its home-market sales were transacted in dollars and therefore obligated Commerce to use the USD price in its calculations.

[2]    Commerce explained that this bank statement is of no use because "the payment amount apparently has no connection with the USD price and quantity shown on the invoice (*i.e.,* the payment amount does not equal USD price times quantity, or to [sic] USD price times quantity plus tax)." Appx001070. The Department therefore concluded that the price shown on the document had no connection to the ultimate payment. *Id.*

The Department, however, would have acted inconsistently with its precedent only if Habaş's home-market sales were negotiated in dollars *and* the dollar price ultimately controlled the amount paid. *See* 2016-17 HRS I&D Memo at 10. Although the company provided evidence that the prices were negotiated, ordered, and set in dollars on the invoice date, Commerce concluded that Habaş did not show that those prices ultimately controlled the final payment. Appx001070–001071.

When determining which currency's value controlled the transaction, Commerce's practice is to look to "the sales value that can be reconciled to the company's audited financial

Case: 24-1158    Document: 18    Page: 61    Filed: 01/16/2024

Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v...., Not Reported in Fed....

statements." Appx001069; *see also Stainless Steel Flanges from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value,* 83 Fed. Reg. 13,244 (Dep't Commerce Mar. 28, 2018) and accompanying Preliminary I&D Memo at 9. Therefore, as in previous investigations, the Department required Habaş to "provide a reconciliation of the sales reported in [its] home market sales databases to the total sales listed in [its] financial statements." Appx001139. The company correspondingly provided audited financial statements in lira, Appx001070, which the agency reconciled with Habaş's reported sales values, Appx001068. Commerce accordingly determined that the lira values controlled the transaction.

The company argues that if the Department could reconcile the lira invoice prices with audited financial records, the dollar prices necessarily reconcile because the lira amount is "directly related to and derived from the USD amount on the invoice." ECF 46, at 12. Commerce, however, explained that Habaş "does not know the payment date of each invoice." Appx001070. Accordingly, the Department could not determine what foreign exchange rate was in effect on the date of the actual payment. *Id.*[3] Because Commerce could not assign a value in dollars to each payment received, it could not reconcile each payment with the dollar value on the corresponding invoice.

[3]   As Habaş points out, the lira experienced "an aberrational and unique devaluation" during the period of review, causing the foreign exchange rates to fluctuate by as much as 17.6 percent month-to-month throughout 2018. ECF 44, at 28–29. A large range of exchange rates therefore could have applied on each payment date.

These facts distinguish this review from Colakoglu's submission in the 2016–17 administrative review. There, the Department determined that prices were negotiated and invoiced in dollars and "the buyer paid the [lira] equivalent amount of the USD price *at the time of payment."* 2016–17 HRS I&D Memo at 9 (emphasis added). Unlike Habaş, therefore, Colakoglu could definitively assign foreign exchange rates to specific payments because it knew each payment date, and Commerce could confirm that Colakoglu was "paid the [lira] amount based on the USD price set on the date of sale and the exchange rate in effect at the time of

payment," so the "USD amount controlled the ultimate [lira] amount paid by the [home-market] customers." *Id.*

**\*4** As the Department explained here, "the currency in which the sales are 'incurred' is not the sole determining factor." Appx001069. Substantial evidence supports Commerce's valuation of Habaş's home-market sales in lira, and the company did not show that the Department acted arbitrarily.

B

Habaş further asserts that "relying on the [lira-]denominated value, converted to U.S. Dollars, introduces an extraordinary distortion to the margin calculations." ECF 44, at 28. This claim derives from Commerce's established practice that disfavors converting prices "into the [home-market] currency at the date of the [home-market] sale and then back to USD at the date of the U.S. sale." 2016–17 HRS I&D Memo at 9; *see also* 19 U.S.C. § 1677b-1(a) (obligating the Department to "convert foreign currencies into United States dollars using the exchange rate in effect on the date of sale of the subject merchandise" instead of the rate in effect on the date of the home-market sale). Converting a U.S. dollar price into lira at the date of the home-market sale and then back into dollars using a different exchange rate at the date of the U.S. sale would therefore distort the home-market price.

The Department, however, did not "convert[ ] the USD-denominated price from U.S. Dollars to Turkish Lira." ECF 44, at 29. It instead directly "relied on Habaş's reported [lira] values, which reconciled to Habaş's audited financial statements." ECF 49, at 26. Therefore, no unnecessary currency conversion occurred.

\* \* \*

For the foregoing reasons, the court denies Habaş's motion for judgment on the agency record and grants judgment on the agency record to the government and Defendant-Intervenors. *See* USCIT R. 56.2(b). A separate judgment will issue. *See* USCIT R. 58(a).

**All Citations**

Not Reported in Fed. Supp., 2023 WL 5985777

Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v...., Not Reported in Fed....

---

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Appx000018**

# 19 U.S.C § 1677b(a)(1)(B)(i)

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as a note under section 1671 of this title.

### § 1677b. Normal value

#### (a) Determination

In determining under this subtitle whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value. In order to achieve a fair comparison with the export price or constructed export price, normal value shall be determined as follows:

##### (1) Determination of normal value

###### (A) In general

The normal value of the subject merchandise shall be the price described in subparagraph (B), at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price under section 1677a(a) or (b) of this title.

###### (B) Price

The price referred to in subparagraph (A) is—

(i) the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price, or

(ii) in a case to which subparagraph (C) applies, the price at which the foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States, if—

(I) such price is representative,

(II) the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold by the exporter or producer in such other country is 5 percent or more of the aggregate quantity (or value) of the subject merchandise sold in the United States or for export to the United States, and

(III) the administering authority does not determine that the particular market situation prevents a proper comparison with the export price or constructed export price.

###### (C) Third country sales

This subparagraph applies when—

(i) the foreign like product is not sold (or offered for sale) for consumption in the exporting country as described in subparagraph (B)(i),

(ii) the administering authority determines that the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison with the sales of the subject merchandise to the United States, or

(iii) the particular market situation in the exporting country does not permit a proper comparison with the export price or constructed export price.

For purposes of clause (ii), the aggregate quantity (or value) of the foreign like product sold in the exporting country shall normally be considered to be insufficient if such quantity (or value) is less than 5 percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States.

##### (2) Fictitious markets

No pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account in determining normal value. The occurrence of different movements in the prices at which different forms of the foreign like product are sold (or, in the absence of sales, offered for sale) in the exporting country after the issuance of an antidumping duty order may be considered by the administering authority as evidence of the establishment of a fictitious market for the foreign like product if the movement in such prices appears to reduce the amount by which the normal value exceeds the export price (or the constructed export price) of the subject merchandise.

##### (3) Exportation from an intermediate country

Where the subject merchandise is exported to the United States from an intermediate country, normal value shall be determined in the intermediate country, except that normal value may be determined in the country of origin of the subject merchandise if—

(A) the producer knew at the time of the sale that the subject merchandise was destined for exportation;

(B) the subject merchandise is merely transshipped through the intermediate country;

(C) sales of the foreign like product in the intermediate country do not satisfy the conditions of paragraph (1)(C); or

(D) the foreign like product is not produced in the intermediate country.

##### (4) Use of constructed value

If the administering authority determines that the normal value of the subject merchandise cannot be determined under paragraph (1)(B)(i), then, notwithstanding paragraph (1)(B)(ii), the normal value of the subject merchandise may be the constructed value of that merchandise, as determined under subsection (e).

##### (5) Indirect sales or offers for sale

If the foreign like product is sold or, in the absence of sales, offered for sale through an affiliated party, the prices at which the foreign like product is sold (or offered for sale) by such affiliated party may be used in determining normal value.

##### (6) Adjustments

The price described in paragraph (1)(B) shall be—

(A) increased by the cost of all containers and coverings and all other costs, charges,

# 19 U.S.C. § 1677b(f)(1)(A)

## (d) Special rule for certain multinational corporations

Whenever, in the course of an investigation under this subtitle, the administering authority determines that—

(1) subject merchandise exported to the United States is being produced in facilities which are owned or controlled, directly or indirectly, by a person, firm, or corporation which also owns or controls, directly or indirectly, other facilities for the production of the foreign like product which are located in another country or countries,

(2) subsection (a)(1)(C) applies, and

(3) the normal value of the foreign like product produced in one or more of the facilities outside the exporting country is higher than the normal value of the foreign like product produced in the facilities located in the exporting country,

it shall determine the normal value of the subject merchandise by reference to the normal value at which the foreign like product is sold in substantial quantities from one or more facilities outside the exporting country. The administering authority, in making any determination under this paragraph, shall make adjustments for the difference between the cost of production (including taxes, labor, materials, and overhead) of the foreign like product produced in facilities outside the exporting country and costs of production of the foreign like product produced in facilities in the exporting country, if such differences are demonstrated to its satisfaction. For purposes of this subsection, in determining the normal value of the foreign like product produced in a country outside of the exporting country, the administering authority shall determine its price at the time of exportation from the exporting country and shall make any adjustments required by subsection (a) for the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States by reference to such costs in the exporting country.

## (e) Constructed value

For purposes of this subtitle, the constructed value of imported merchandise shall be an amount equal to the sum of—

(1) the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade;

(2)(A) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(B) if actual data are not available with respect to the amounts described in subparagraph (A), then—

(i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

(ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the subject merchandise in condition packed ready for shipment to the United States.

For purposes of paragraph (1), if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology. For purposes of paragraph (1), the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition that is remitted or refunded upon exportation of the subject merchandise produced from such materials.

## (f) Special rules for calculation of cost of production and for calculation of constructed value

For purposes of subsections (b) and (e).—[1]

### (1) Costs

#### (A) In general

Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the ex-

---

[1] So in original. The period preceding the dash probably should not appear.

porter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs.

**(B) Nonrecurring costs**

Costs shall be adjusted appropriately for those nonrecurring costs that benefit current or future production, or both.

**(C) Startup costs**

**(i) In general**

Costs shall be adjusted appropriately for circumstances in which costs incurred during the time period covered by the investigation or review are affected by startup operations.

**(ii) Startup operations**

Adjustments shall be made for startup operations only where—

(I) a producer is using new production facilities or producing a new product that requires substantial additional investment, and

(II) production levels are limited by technical factors associated with the initial phase of commercial production.

For purposes of subclause (II), the initial phase of commercial production ends at the end of the startup period. In determining whether commercial production levels have been achieved, the administering authority shall consider factors unrelated to startup operations that might affect the volume of production processed, such as demand, seasonality, or business cycles.

**(iii) Adjustment for startup operations**

The adjustment for startup operations shall be made by substituting the unit production costs incurred with respect to the merchandise at the end of the startup period for the unit production costs incurred during the startup period. If the startup period extends beyond the period of the investigation or review under this subtitle, the administering authority shall use the most recent cost of production data that it reasonably can obtain, analyze, and verify without delaying the timely completion of the investigation or review. For purposes of this subparagraph, the startup period ends at the point at which the level of commercial production that is characteristic of the merchandise, producer, or industry concerned is achieved.

**(2) Transactions disregarded**

A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would

have been if the transaction had occurred between persons who are not affiliated.

**(3) Major input rule**

If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2).

(June 17, 1930, ch. 497, title VII, §773, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 182; amended Pub. L. 98–573, title VI, §§615, 620(b), Oct. 30, 1984, 98 Stat. 3036, 3039; Pub. L. 99–514, title XVIII, §1886(a)(11), Oct. 22, 1986, 100 Stat. 2922; Pub. L. 100–418, title I, §§1316(a), 1318, 1319, Aug. 23, 1988, 102 Stat. 1186, 1189; Pub. L. 103–465, title II, §224, Dec. 8, 1994, 108 Stat. 4878; Pub. L. 114–27, title V, §§504(b), (c), 505, June 29, 2015, 129 Stat. 385.)

**Editorial Notes**

AMENDMENTS

2015—Subsec. (a)(1)(B)(ii)(III). Pub. L. 114–27, §504(b), which directed amendment of subcl. (III) by striking out "in such other country.", was executed by striking out "in such other country" after "particular market situation" to reflect the probable intent of Congress.

Subsec. (b)(2)(A). Pub. L. 114–27, §505(a), added subpar. (A) and struck out former subpar. (A). Prior to amendment, text read as follows: "There are reasonable grounds to believe or suspect that sales of the foreign like product were made at prices that are less than the cost of production of the product, if—

"(i) in an investigation initiated under section 1673a of this title or a review conducted under section 1675 of this title, an interested party described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title provides information, based upon observed prices or constructed prices or costs, that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of the product; or

"(ii) in a review conducted under section 1675 of this title involving a specific exporter, the administering authority disregarded some or all of the exporter's sales pursuant to paragraph (1) in the investigation or if a review has been completed, in the most recently completed review."

Subsec. (c)(5). Pub. L. 114–27, §505(b), added par. (5).

Subsec. (e). Pub. L. 114–27, §504(c)(2), in concluding provisions, substituted "For purposes of paragraph (1), if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology. For purposes of paragraph (1), the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition that is remitted or refunded upon exportation of the subject merchandise produced from such materials." for "For purposes of paragraph (1), the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition which are remitted