**2024-1158**

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

### HABAŞ SINAI VE TIBBI GAZLAR ISTIHSAL ENDUSTRISI A.S.,
*Plaintiff-Appellant*

v.

### UNITED STATES, CLEVELAND-CLIFFS INC., STEEL DYNAMICS, INC., SSAB ENTERPRISES LLC,
*Defendants-Appellees.*

---

Appeal from United States Court of International Trade
Court No. 1:21-cv-00527-MMB, Judge M. Miller Baker

---

### NONCONFIDENTIAL RESPONSE BRIEF OF
### DEFENDANT-APPELLEE UNITED STATES

---

BRIAN N. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:                     EMMA E. BOND
ALEXANDER FRIED                 Trial Attorney
Attorney                        Commercial Litigation Branch
Office of the Chief Counsel     Civil Division
  For Trade Enforcement and Compliance   U.S. Department of Justice
U.S. Department of Commerce     1100 L Street, N.W.
Washington, D.C.                Washington, D.C. 20005

February 26, 2024               Attorneys for Defendant-Appellee

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES ............................................................. iv

STATEMENT OF RELATED CASES ................................................ 1

STATEMENT OF CONFIDENTIAL INFORMATION ........................................ 2

INTRODUCTION ............................................................................ 3

STATEMENT OF THE ISSUE ........................................................... 4

STATEMENT OF THE FACTS ........................................................... 4

    1. Legal Framework For Antidumping Duty Proceedings ...................... 4

    II. Commerce Initiates An Administrative Review For The Period Covering October 1, 2018, To September 30, 2019 ........................... 5

    III. Commerce Preliminarily Uses Habaş's Lira-Denominated Prices To Calculate Normal Value ..................................................... 6

    IV. In The Final Results, Commerce Continues To Use Habaş's Lira-Denominated Prices To Calculate Normal Value .............................. 8

    V. The Court Of International Trade Sustains Commerce's Final Results ................................................................................. 11

SUMMARY OF THE ARGUMENT ................................................... 11

ARGUMENT.................................................................................. 13

    1. Standard Of Review ......................................................... 13

    II. Commerce Reasonably Valued Habaş's Home Market Sales Using The Only Information On The Record That It Found To Be Reliable.............................................................................. 14

A.  To Be Reliable, A Company's Home Market Prices Must Be Reconciled To Its Financial Records ...................................... 14

B.  Habaş's Lira-Denominated Prices Reconciled To Its Financial Records, But The Dollar-Denominated Prices Did Not ............. 16

C.  Habaş Fails To Establish Any Error In Commerce's Finding That The Dollar-Denominated Prices Were Not Reliable To Value The Home Market Sales ............................................... 17

III.  Commerce Reasonably Used The Lira-Denominated Prices When Those Prices Controlled The Amounts Ultimately Paid By The Purchaser ......................................................................... 20

A   Substantial Evidence Supports Commerce's Finding That The Lira-Denominated Home Market Prices Controlled The Final Price Paid By The Purchaser .................................................. 21

1.  Only The Lira-Denominated Prices For Habaş's Home Market Sales Reconciled With Habaş's Accounting Records .................................................................... 21

2.  Habaş Failed To Provide Payment Dates Or Exchange Rates Linking The Lira-Denominated Accounting Records To The Reported Dollar Prices ....................... 22

3.  Available Payment Information In Dollars Did Not Align With The Dollar-Denominated Unit Price On The Invoice ........................................................................ 23

B.  Commerce's Methodology Was Reasonable And Accords With Its Approach In Past Proceedings ........................................... 25

C.  Habaş's Arguments Regarding The "Transaction Currency" Are Unpersuasive ........................................................................ 28

IV.　　Using Lira-Denominated Prices Creates No Absurd Results When Those Prices Represent The Final Prices For Habaş's Home Market Sales ............................................................................................... 31

CONCLUSION ................................................................................................. 32

**CONFIDENTIAL MATERIAL REDACTED**

The confidential data omitted from page 24 describes prices, quantities, and a percentage taken from a sales invoice submitted pursuant to an administrative protective order.  Redacted information is summarized accordingly.

# TABLE OF AUTHORITIES

## CASES

*Armstrong Bros. Tool Co. v. United States*,
626 F.2d 168 (1980)......................................................................25

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) .....................................................14

*Ceramark Tech., Inc. v. United States*,
11 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ....................................25

*Changshan Peer Bearing Co., Ltd. v. United States*,
953 F. Supp. 2d 1354 (Ct. Int'l Trade 2014)...................................27

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)......................................................................13

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)................................................................14, 25

*Downhole Pipe & Equip., L.P. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015) ...............................................13, 25

*Eregli Demir ve Celik Fabrikalari T.A.S. v. United States*,
308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018)...................................31

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996) .......................................................16

*Nakornthai Strip Mill Pub. Co. v. United States*,
587 F. Supp. 2d 1303 (Ct. Int'l Trade 2008)...................................26

*Nan Ya Plastics Corp. v. United States*,
810 F.3d 1333 (Fed. Cir. 2016) .....................................................22

*Ningbo Dafa Chem. Fiber Co. v. United States*,
580 F.3d 1247 (Fed. Cir. 2009) .....................................................14

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014) ........................................26
*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) ........................................22

*SeAH Steel VINA Corp. v. United States*,
    950 F.3d 833 (Fed. Cir. 2020) ..........................................25

*Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*,
    975 F.2d 807 (Fed. Cir. 1992) ..........................................13

*Union Steel v. United States*,
    713 F.3d 1101 (Fed. Cir. 2013) ........................................13

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i)........................................... 4, 13

19 U.S.C. § 1673.......................................................... 1

19 U.S.C. § 1675(a)(1)(B), 2(A) ........................................ 4

19 U.S.C. § 1675(a)(2)(A)(ii)........................................... 4

19 U.S.C. § 1677b-1 ....................................................8, 10

19 U.S.C. § 1677b-1(a)..................................................31

19 U.S.C. § 1677b(b)(1)................................................. 7

19 U.S.C. § 1677b(a)(1)(B)(i) .......................................... 5

19 U.S.C. § 1677b(f)(1)(A)..............................................30

19 U.S.C. § 1677(35)(A)................................................. 4

## RULES

Rule 47.5 ............................................................................................ 1

Rule 28(d) ......................................................................................... 2

Fed. R. App. P. 25(c)(2) ................................................................... 2

**REGULATIONS**

19 C.F.R. § 351.307(a) ................................................................... 16

19 C.F.R. § 351.415 ...................................................................8, 31

**FEDERAL REGISTER NOTICES**

*Notice of Amendment of Final Determinations of Sales at Less Than Fair Value:
Stainless Steel Plate in Coils from the Republic of Korea; and Stainless Steel
Sheet and Strip in Coils from the Republic of Korea,*
66 Fed. Reg. 45,279 (August 28, 2001) ........................................9, 10

*Certain Steel Concrete Reinforcing Bars from Turkey; Final Results of
Antidumping Duty Administrative Review,*
66 Fed. Reg. 56,274 (Dep't of Commerce, Nov. 7, 2001). ...................9, 21, 26

*Certain Cold-Rolled Carbon Steel Flat Products From Turkey, Notice of Final
Determination of Sales at Less Than Fair Value;*
67 Fed. Reg. 62,126 (Dep't Commerce Oct. 3, 2002) ..................................4, 27

*Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic
of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom,*
81 Fed. Reg. 67,962 (Dep't Commerce Oct. 3, 2016) ....................................... 5

*Stainless Steel Flanges from the People's Republic of China: Preliminary
Affirmative Determination of Sales at Less Than Fair Value,*
83 Fed. Reg. 13,244 (Dep't Commerce Mar. 28, 2018) ............................passim

*Stainless Steel Flanges From the People's Republic of China: Final Affirmative
Determination of Sales at Less Than Fair Value,*
83 Fed. Reg. 26,959 (June 11, 2018) ................................................................15

*Certain Hot-Rolled Steel Flat Products from the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*,
84 Fed. Reg. 30,694 (June 27, 2019)…......................................................passim

*Certain Hot-Rolled Steel Flat Products from Turkey*, *Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*
84 Fed. Reg. 68,878 (Dep't Commerce Dec. 17, 2019),....................................27

*Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*,
87 Fed. Reg. 22,179 (Dep't of Commerce, Apr. 14, 2022)................................ 7

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5, defendant-appellee's counsel states that she is unaware of any other appeal in or from this action previously before this Court or any other appellate court under the same or similar title.  Defendant-appellee's counsel is also unaware of any case pending in this or any other court that may directly affect or be affected by the Court's decision in this appeal.

## <u>STATEMENT OF CONFIDENTIAL INFORMATION</u>

Pursuant to Federal Circuit Rule 28(d), defendant-appellee, the United

States, states that this response brief contains certain confidential business

proprietary information protected by the Administrative Protective Order in the

underlying agency proceeding.  Such confidential business proprietary information

(BPI) consists of information contained in business proprietary documents and data

provided by plaintiff-appellants Habaş Sinai ve Tibbi Gazlar Istihsal Endustrisi

A.S. (Habaş), to the Department of Commerce.  During the underlying proceeding,

Commerce accepted the BPI designation and accorded confidential treatment to the

BPI.

Accordingly, confidential information has been redacted from page 24 of the

non-confidential version of this response brief.

Finally, pursuant to Federal Rule of Appellate Procedure 25(c)(2) and with

the written consent from counsel for Habaş and counsel for appellees Cleveland-

Cliffs Inc., Steel Dynamics, Inc. and SSAB Enterprises LLC, the confidential

version of this response brief has been served via secured electronic delivery.

## **INTRODUCTION**

This case involves the valuation of sales made by plaintiff-appellant, Habaş Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. (Habaş), a Turkish producer and exporter of hot-rolled steel flat products.  In an antidumping duty proceeding, Habaş provided data regarding its sales of relevant merchandise in its home country, the Republic of Turkey (Turkey).  Habaş reported its home market prices in both U.S. dollars (USD or dollars) and Turkish lira (lira), but recorded only lira-denominated prices in its accounting system.

The Department of Commerce determined that the lira-denominated prices were the final prices for Habaş's home market sales and represented the only reliable sales data that could be reconciled with Habaş's financial records.  By contrast, Commerce found that the USD prices had no connection to the final prices paid by the purchaser.  As Commerce explained, (1) the USD prices reported by Habaş could not be reconciled to Habaş's financial statements, (2) Habaş failed to provide payment dates or exchange rates required to link the USD prices to the payment data recorded in lira, and (3) for the one sample sale with payment data in dollars, the USD payment price had no connection to the invoice price.  Consistent with these findings, Commerce reasonably used the lira-denominated prices to value Habaş's home market sales.

## STATEMENT OF THE ISSUE

Whether Commerce's use of lira-denominated prices instead of dollar-denominated prices to value the respondent's home market sales was supported by substantial evidence and in accordance with the law?

## STATEMENT OF THE FACTS

I.      Legal Framework For Antidumping Duty Proceedings

The antidumping statute is a remedial law authorizing Commerce to impose duties on imports of foreign merchandise that are sold in the United States at less than fair value, when a domestic industry is materially injured by such imports (or threatened with such injury). 19 U.S.C. § 1673. Once an antidumping duty order is imposed, Commerce conducts administrative reviews to determine the amount of any antidumping duty during the relevant period. 19 U.S.C. §§ 1675(a)(1)(B), (2)(A).

To determine the duty in an administrative review, Commerce calculates a "dumping margin" for each entry of merchandise subject to review. 19 U.S.C. § 1675(a)(2)(A)(ii). A dumping margin is the amount by which the "normal value" exceeds the United States export price or constructed export price for the merchandise. *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)). The "normal value" ordinarily means "the

price at which the foreign like product is first sold . . . for consumption in the exporting country," in the ordinary course of trade.  19 U.S.C. § 1677b(a)(1)(B)(i).

## II. Commerce Initiates An Administrative Review For The Period Covering October 1, 2018, To September 30, 2019

In 2016, Commerce issued an antidumping order covering certain hot-rolled steel flat products from Turkey.  *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom*, 81 Fed. Reg. 67,962 (Dep't Commerce Oct. 3, 2016).

On December 11, 2019, Commerce initiated the third administrative review of the antidumping duty order covering the period October 1, 2018, to September 30, 2019, Appx1089-1095, and selected Habaş as the mandatory respondent, Appx1096-1101.

In the initial questionnaire, Commerce requested information regarding Habaş's home market sales.  *See, e.g.*, Appx1134 (questionnaire regarding "Sales in the Home Market or to a Third Country").  Among other information, Commerce requested Habaş's home market sales database and a reconciliation of those sales with Habaş's financial statements.  Appx1134-1139.  Commerce instructed that Habaş's home market sales "reconciliation *must* provide supporting documentation (*e.g.*, financial statements, trial balance sheets, relevant excerpts

5

from general ledger, sub-ledger, *etc.*) *for each* step in the reconciliation."[1]
Appx1139.

For its home market sales data, Habaş reported sales values in both dollars
and lira, but only the lira-denominated prices were "booked into the accounting
system." Appx1631-1632 & Appx1699-1715. Habaş reconciled the lira-
denominated prices for its home market sales data to its accounting system and
audited financial statements. Appx1712-1715 (reconciling home market sales);
Appx2022-2028 (supplemental home market sales data and reconciliation). By
contrast, Habaş's reconciliation for its U.S. sales linked both the prices in both lira
and dollars to Habaş's accounting records. Appx1737-1740 (reconciling U.S.
sales).

## III. Commerce Preliminarily Uses Habaş's Lira-Denominated Prices To Calculate Normal Value

On February 24, 2021, Commerce published the preliminary results,
preliminarily calculating a weighted-average dumping margin for Habaş of 21.49
percent. Appx3049.

---

[1] Ledger means "{a} book or series of books used for recording financial
transactions in the form of debits and credits; esp., a book in which a business or
bank records how much money it receives and spends." Ledger, Black's Law
Dictionary (11th ed. 2019).

In calculating the normal value, Commerce used home market prices denominated in lira.  Appx3024.  Although Habaş claimed that its home market sales were made in dollars, Commerce found that the lira-denominated price also appeared on the sample invoice, Appx3036, Appx1353, and were "the only sale values that {could} be directly tied to the audited financial records," Appx3024, Appx3036.  Commerce therefore divided Habaş's home market sale values in Turkish lira by the sales quantity to "derive a home market unit price denominated in {lira}."  Appx3024; *see also* Appx3036-3037.

Commerce also disregarded Habaş's home market sales made below the cost of production and used the remaining sales as the basis for determining normal value.  Appx3028; Appx3026-3028; 19 U.S.C. § 1677b(b)(1).  Relevant to the sales-below-cost test, Commerce found high inflation at a rate of at least 25 percent during the reporting period.  Appx3021.[2]  Consistent with its high inflation methodology[3], Commerce indexed Habaş's reported monthly costs of production to account for inflation.  Appx3021.

---

[2]  *See also* Appx3017 (defining the period of review and the reporting period); Appx1134 (instructions regarding the reporting period to Habaş in Commerce's initial questionnaire).

[3]  *See, e.g.*, *Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22,179 (Dep't of Commerce, Apr. 14, 2022), and accompanying IDM at cmt. 2 (discussing Commerce's high-inflation methodology).

Another part of Commerce's "high inflation" methodology is to compare U.S. prices to monthly normal values "for the same month as the U.S. sale." *See* Appx3021. Habaş's single shipment of merchandise to the United States occurred on August 2, 2018. Appx3021; Appx3017. In the preliminary results, therefore, Commerce compared U.S. prices to a monthly average of the home market sales in August 2018. Appx3021; *see also* Appx43 (discussing the preliminary results).

Finally, to compare the normal value with the export price, Commerce converted the Turkish lira prices "into United States dollars using the exchange rate in effect on the date of sale of the subject merchandise." 19 U.S.C. § 1677b-1; Appx3029 (citing section 773A of the Tariff Act of 1930, as amended, codified at 19 U.S.C. § 1677b-1; 19 C.F.R. § 351.415).

IV.    In The Final Results, Commerce Continues To Use Habaş's Lira-Denominated Prices To Calculate Normal Value

In its case brief challenging the preliminary results, Habaş argued that Commerce should have used dollar-denominated prices for Habaş's home market sales. Appx38-39 (citation omitted). According to Habaş, past Commerce decisions used the dollar price for home market sales "when contracts, confirmation, and payments" were made in dollars, "even though the accounting records were in {lira}." Appx39 (citations omitted). Habaş also argued that using lira-denominated prices would distort the margin because of movements in exchange rates occurring in August 2018. Appx39 (citations omitted).

8

Commerce rejected Habaş's arguments and continued to use the prices in lira to calculate normal value in the final results. Appx40-45. Commerce explained that an accurate sales reconciliation is required to calculate "an accurate weighted-average dumping margin," and that only the lira-denominated sales reconciled to Habaş's financial statements. Appx40-41 (citations omitted). Thus, only the lira-denominated sales values were "reliable" for calculating normal value. Appx41.

Commerce also found that the past proceedings cited by Habaş were distinguishable. Appx42-43 (citations omitted). In the cited prior proceedings, the record showed that the dollar-denominated prices "determined" the final payment amounts. Appx42.[4] By contrast, the record in this proceeding showed that Habaş's reported USD price had "no connection with the ultimate payment." Appx42-43. Indeed, Commerce found that Habaş could not provide payment dates—or exchange rates—on a transaction-specific basis, and thus could not link

---

[4] *See* Appx42 (citing *Certain Steel Concrete Reinforcing Bars from Turkey; Final Results of Antidumping Duty Administrative Review*, 66 Fed. Reg. 56,274 (Dep't of Commerce, Nov. 7, 2001); *Notice of Amendment of Final Determinations of Sales at Less Than Fair Value: Stainless Steel Plate in Coils from the Republic of Korea; and Stainless Steel Sheet and Strip in Coils from the Republic of Korea*, 66 Fed. Reg. 45,279 (August 28, 2001); *Hot-Rolled Steel Flat Products from the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 30,694 (June 27, 2019).

the USD prices to the "final" payment amount.  Appx42-43.  Further, Habaş's sample home market sale showed that the payment amount in dollars did not match the price on the invoice.  Appx42.  The lira-denominated prices, by contrast, did reconcile with the payment data recorded in Habaş's financial records.  Appx40-42.  Accordingly, Commerce found that the lira-denominated price for the home market sales reflected "the final price" paid by the purchaser.  Appx42-43.

Finally, Commerce rejected Habaş's argument alleging distortion from a change in exchange rates after the U.S. sale made on August 2, 2018.  Appx43-45.  As Commerce explained, the exchange rate for converting foreign currencies into dollars is established by statute and regulation, and requires use of "the exchange rate in effect on the date of sale of the subject merchandise."  Appx43-44 (quoting Section 773A of the Tariff Act of 1930, as amended, codified at 19 U.S.C. § 1677b-1); *see also* 19 C.F.R. § 351.415.  Consistent with this authority, Commerce converted the lira-denominated prices of relevant August 2018 home market sales to USD prices "using the exchange rate in effect on August 2, 2018 . . . certified by the Federal Reserve Bank."  Appx43 (citations omitted); *see also* Appx43-45.

After correcting certain cost adjustment issues raised by petitioners, Appx45, Commerce determined a final weighted-average dumping margin for Habaş of 24.32 percent.  Appx47.

V.    <u>The Court Of International Trade Sustains Commerce's Final Results</u>

Habaş challenged Commerce's final results by filing a complaint in the United States Court of International Trade.  Appx5.

The trial court affirmed Commerce's final results, holding that "{s}ubstantial evidence supports Commerce's valuation of Habaş's home-market sales in lira."  Appx11.  The court also held that the company "did not show that the Department acted arbitrarily," Appx11, rejecting Habaş's argument that Commerce had acted inconsistently with its past practice.  Appx8-9.  As the trial court explained, prior agency decisions used U.S. dollar values only when the respondent's "home-market sales were negotiated in dollars *and* the dollar price ultimately controlled the amount paid."  Appx9 (citation omitted).  Consistent with this practice, the trial court held that Commerce reasonably determined that Habaş's "lira values controlled the transaction."  Appx10-11.

This appeal followed.

## SUMMARY OF THE ARGUMENT

Commerce reasonably used the lira-denominated prices to value Habaş's home market sales, for two independent reasons.  First, the lira-denominated prices provided the only reliable record evidence of the value of Habaş's home market sales.  As Commerce explained, an accurate sales reconciliation is necessary to confirm that a respondent has accurately and completely reported its home market

sales.  The lira-denominated prices successfully reconciled with Habaş's financial records, confirming the reliability of those prices.  By contrast, Commerce could not reconcile Habaş's USD prices with the lira-denominated payment data.  Thus, Commerce reasonably used Habaş's lira-denominated prices—the only reliable values on the record for Habaş's home market sales.

Second, the lira-denominated prices—not the USD unit price—controlled the final price paid for Habaş's home market sales.  Substantial evidence supports Commerce's finding on this point.  Not only were the lira-denominated prices the only values that could be reconciled with the financial statements, but Habaş did not provide payment dates or exchange rates to link the USD prices with the payment amounts in lira.  Finally, for the one sample sale with payment data in USD, the invoiced dollar price had no connection to the price actually paid.

Habaş nonetheless argues that Commerce was required to use Habaş's dollar-denominated prices because Commerce used the respondent's dollar values in prior proceedings.  But each review is a separate proceeding that is reviewed on its own record, and the respondent—here, Habaş—bears the burden to develop the record.  Unlike the respondents in prior reviews, Habaş failed to establish that the reported USD price controlled the final amount paid by the purchaser for the home market sales.  Instead, the lira-denominated price reflected the final price paid by the purchaser.  Because Commerce's determination is lawful and supported by

12

substantial evidence, the Court should affirm the trial court's judgment sustaining Commerce's final results.

## **ARGUMENT**

I.    Standard Of Review

This Court will uphold Commerce's determination using lira-denominated values for Habaş's home market sales, unless it is unsupported by substantial record evidence or otherwise unlawful. *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). With respect to legal and factual issues in Commerce's determination, this Court applies "the same standard used by the trial court in its consideration of Commerce's determination." *Id.* Thus, this Court reviews the trial court's decision *de novo*, while at the same time recognizing the Court of International Trade's "unique and specialized expertise in trade law." *Id.*

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted). In reviewing whether an agency's decision is supported by substantial evidence, the court may not "reweigh the evidence or . . . reconsider questions of fact anew." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015) (quoting *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir.

13

1992)).  Substantial evidence may be "less than the weight of the evidence," and

the possibility of drawing inconsistent conclusions from the record does not render

Commerce's findings unsupported by substantial evidence.  *Consolo v. Fed. Mar.*

*Comm'n*, 383 U.S. 607, 620 (1966); *see also Atl. Sugar, Ltd. v. United States*, 744

F.2d 1556, 1562 (Fed. Cir. 1984).

II.    Commerce Reasonably Valued Habaş's Home Market Sales Using The Only
       Information On The Record That It Found To Be Reliable

The Court should affirm Commerce's use of the lira-denominated prices

because those prices provided the only reliable record evidence to value Habaş's

home market sales.  Appx40-42.

A.    To Be Reliable, A Company's Home Market Prices Must Be
       Reconciled To Its Financial Records

As "master of antidumping duty law," Commerce is entitled to deference in

assessing the reliability of sales data submitted during an antidumping duty

proceeding.  *See Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247,

1259 (Fed. Cir. 2009) (citation omitted) (describing the methodologies used by

Commerce as "presumptively correct").  Exercising its authority, Commerce has

repeatedly explained that a successful sales reconciliation is necessary to confirm

the reliability and completeness of a company's sales data. *See, e.g.*, Appx40-41;

*Stainless Steel Flanges from the People's Republic of China: Preliminary*

*Affirmative Determination of Sales at Less Than Fair Value* (*Stainless Steel*

14

*Flanges*), 83 Fed. Reg. 13,244 (Dep't Commerce Mar. 28, 2018), and

accompanying Prelim. Decision Mem. (PDM) at 9, *unchanged in final determ.*, 83

Fed. Reg. 26,959 (June 11, 2018).

A sales reconciliation checks a company's sales data against its accounting

ledger and financial statements, showing whether the respondent "accurately and

completely" reported the universe and amount of relevant sales.  Appx40; *Flanges*

*from China*, 83 Fed. Reg. 13,244, and accompanying PDM at 9.  "Each portion of

the reconciliation demonstrates a particular point of accuracy which, when

considered together, can give Commerce confidence that a respondent accurately

and completely reported" its sales data.  *Flanges from China*, 83 Fed. Reg. 13,244,

and accompanying PDM at 9.  Without that confirmation, "invoices supporting

individual reported sales, on their own, are of minimal utility."  *Id.*  Without

checking sales data against a company's financial statement and ledger, Commerce

cannot "ensure that there were not additional, unreported sales" or that the reported

prices are accurate.  *See id.*; Appx40.

Consistent with its practice regarding reconciliation, Commerce instructed

Habaş to provide a reconciliation for its home market sales, including "supporting

documentation (e.g., financial statements, trial balance sheets, relevant excerpts

from general ledger, sub-ledger, etc.) for each step in the reconciliation."  Appx41

n.48 (quoting Appx1139).  Commerce also requested copies of Habaş's financial

15

statements, explaining that "{a} detailed understanding of {its} accounting and financial practices will help to ensure an accurate verification."  Appx1128. Verification refers to the process in which Commerce examines a party's records to determine "the adequacy and accuracy" of information submitted.  Appx1249; *see also* 19 C.F.R. § 351.307(a) (stating that before "issuing final results of review, the Secretary may verify relevant factual information"); 19 U.S.C. § 1677m(i) (discussing verification).

B.    Habaş's Lira-Denominated Prices Reconciled To Its Financial
Records, But The Dollar-Denominated Prices Did Not

In this case, Commerce reasonably determined that the lira-denominated prices were the only prices that could be reconciled with Habaş's financial records, and, thus, the only reliable evidence for Habaş's home market sales.  Appx40-41. This is precisely the type of "complex . . . accounting decisions of a technical nature" that frequently arise in antidumping duty proceedings and "for which agencies possess far greater expertise than courts."  *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (citations omitted).

As Commerce explained, the dollar-denominated prices requested by Habaş were not "reliable" because they could not be reconciled with the company's financial data.  Appx40.  Commerce found that Habaş did "not know the payment date of each invoice," and thus did not know "the exchange rate in effect on the payment date."  Appx42; *see also* Appx1628 (Habaş Section B-C Questionnaire

Responses).  Unlike the lira-denominated prices, the prices in dollars could not "be

directly tied" to Habaş's financial records.  *See* Appx40 (citation omitted).  Under

these circumstances, Commerce reasonably determined that "only the {lira}-

denominated sales values are reliable for calculating normal value."  Appx41.

> C.    Habaş Fails To Establish Any Error In Commerce's Finding That The
>        Dollar-Denominated Prices Were Not Reliable To Value The Home
>        Market Sales

Habaş raises several challenges to Commerce's findings, none of which are

persuasive.

First, as a general matter, Habaş argues that Commerce should have used its

dollar-denominated prices because a sample order and invoice for a sample home

market sale show that the sale was negotiated and agreed to in dollars.  *See*, *e.g.*,

Applnt. Br. at 20-21 (citing Appx1350-1360).  But the sample invoice also

included prices in lira, Appx3036, Appx1353, and, regardless, such invoices and

other sales data  are of "minimal utility" unless they can be reconciled to a

company's financial records, *Flanges from China*, 83 Fed. Reg. 13,244, and

accompanying PDM at 9.  Commerce reasonably used the lira-denominated prices,

which could be reconciled  to Habaş's financial records, rather than the USD

prices, which could not.  Appx40-42.

Second, contrary to Habaş's suggestion, Commerce did not use the lira-

denominated prices simply because Habaş was required to "report its financial

statements in Turkish Lira per Turkish law." *See* Applnt. Br. at 22.  Indeed, Habaş

was able to link the USD prices for its U.S. sales to the lira-denominated financial

statements and Commerce relied on these dollar-denominated prices for the U.S.

sales.  Appx41-42; *see also* Appx1737-1738 (U.S. sales reconciliation).  Further,

the same requirement to maintain financial accounts in lira applied in the first

administrative review of the same order, in which Commerce used USD prices for

the respondent's home market sales. *See Certain Hot-Rolled Steel Flat Products*

*From the Republic of Turkey: Final Results of Antidumping Duty Administrative*

*Review and Final Determination of No Shipments; 2016-2017* (*2016-17 HRS*

*Review*), 84 Fed. Reg. 30,694 (Dep't of Commerce, June 27, 2019), and

accompanying Issues and Decision Mem. (IDM) at cmt. 2.  Thus, the requirement

to maintain records in lira does not itself prevent respondents from providing the

necessary data to reconcile USD prices with financial records.

Commerce's reasoning in the first administrative review highlights the

information missing in this proceeding that prevented Commerce from reconciling

Habaş's USD prices to the payment data in lira.  As the trial court correctly

explained, the respondent in the first administrative review, Colakoglu, could

definitively assign date of sale and "foreign exchange rates to specific payments."

Appx10-11 (quoting *2016-17 HRS Review* IDM at cmt. 2) (cleaned up).  This

allowed Commerce to "confirm" that these respondents were "paid the {lira}

amount based on the USD price set on the date of sale." Appx11 (quoting *2016-17 HRS Review* IDM at 9). In this proceeding, by contrast, Habaş did not provide the payment date or exchange rate necessary to link the USD price for the home market sales to the lira-denominated payment data in its accounting records. Appx41-42; Appx1628.

Habaş next argues that the dollar-denominated prices for its home market sales actually *do* reconcile with its financial records. Applnt. Br. at 23; *id.* at 21. According to Habaş, the fact that the lira-denominated "sales values reconcile necessarily indicates that the dollar prices also reconcile"—on the grounds that the "{lira} values are derived from the USD amounts on the invoices." *Id.* at 23. This argument is wrong and conflicts with Habaş's reference to "the volatile exchange rate" between dollars and lira. *See id.* at 25. The fact that the invoiced dollar prices and lira prices matched on the date of the invoice does not mean the same is true on a different date—here, the date of payment. Habaş failed to provide payment dates or exchange rates necessary to link the invoiced USD prices to the payment data in Habaş's accounting records. Appx42 (citing Appx1628). As the trial court explained, "Commerce could not assign a value in dollars to each payment received," and thus "could not reconcile each payment with the dollar value on the corresponding invoice." Appx10, Appx17.

19

Finally, to the extent Habaş argues that Commerce did reconcile the dollar-denominated prices for the home market sales, it is simply wrong. *See* Applnt. Br. at 20-21 (citing Appx1697-1715; Appx1728-1740). The dollar values for Habaş's sales *in the United States* reconciled with Habaş's accounting records. *See* Appx41-42. Indeed, Habaş's U.S. sales reconciliation lists prices in both lira and dollars. Appx1738; Appx42. The same is not true for Habaş's home market reconciliation, which lists prices only in lira. Appx40-42; Appx1713. Because the lira-denominated prices provided the only reliable evidence of Habaş's home market sales, Commerce's use of those prices should be sustained.[5]

III.    Commerce Reasonably Used The Lira-Denominated Prices When Those Prices Controlled The Amounts Ultimately Paid By The Purchaser

As a second and independent basis for affirmance, Commerce reasonably used the lira-denominated prices for Habaş's home market sales when those prices established the "final price" paid by the purchaser. Appx42-43. In antidumping duty proceedings, Commerce requires respondents to report "'the sale price, discounts, rebates and all other revenues and expenses . . . in the currencies in

---

[5] Habaş also argues that Commerce's practice regarding sales reconciliations "is in direct contradiction" to its rejection of Habaş's arguments regarding the "transaction currency." Applnt. Br. at 26. But Commerce's initial questionnaire does not mention the term "transaction currency." Appx41. By contrast, the questionnaire clearly sets forth the expectations with respect to reconciling sales data with financial records. Appx41 n.48 (quoting Appx1139).

which they were earned or incurred.'" *2016-17 HRS Review*, 84 Fed. Reg. 30,694, and IDM at cmt. 2; *see also* Appx1152 (initial questionnaire).  When determining the sales price, Commerce has used the price that "controls" the ultimate amount that the purchaser pays for the sale. *2016-17 HRS Results*, 84 Fed. Reg. 30,694, and IDM at cmt. 2; *Certain Steel Concrete Reinforcing Bars From Turkey; Final Results of Antidumping Duty Administrative Review*, 66 Fed. Reg. 56274 (Nov. 7, 2001), and accompanying IDM at cmt. 4 (using the agreed-upon price that "remained unchanged" at the time of payment).

As discussed below, substantial evidence supports Commerce's finding that the lira-denominated values represented the final prices controlling the amount paid for Habaş's home market sales.  Further, Commerce's use of these prices was reasonable and consistent with past proceedings.  Habaş's arguments to the contrary are unpersuasive.

A.    Substantial Evidence Supports Commerce's Finding That The Lira-Denominated Home Market Prices Controlled The Final Price Paid By The Purchaser

Substantial evidence supports Commerce's finding that the lira-denominated price controlled the ultimate amount paid for Habaş's home market sales, for three primary reasons.

21

1      Only The Lira-Denominated Prices For Habaş's Home Market Sales Reconciled With Habaş's Accounting Records

First, when determining the prices that controlled a transaction, "Commerce's practice is to look to 'the sales value that can be reconciled to the company's audited financial statements.'"  Appx9 (citing Appx41; *Stainless Steel Flanges*, 83 Fed. Reg. 13,244, and PDM at 9).  As Commerce explained, Habaş was able to reconcile the lira-denominated prices of its home market sales with its financial records, including the ledger and audited financial statements.  Appx40 (citing *Stainless Steel Flanges*, 83 Fed. Reg. 13,244, and accompanying PDM at 9).  This supports Commerce's finding that the prices in lira—not the USD prices—control the final amount paid by the purchaser.  Appx42-43.

2.      Habaş Failed To Provide Payment Dates Or Exchange Rates Linking The Lira-Denominated Accounting Records To The Reported Dollar Prices

Second, Commerce's finding is consistent with the absence of record evidence linking the USD prices to the payment amount in lira for the home market sales.  "{T}he burden of creating an adequate record lies with interested parties and not with Commerce."  *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337–38 (Fed. Cir. 2016) (quoting *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).

Despite this obligation, Habaş could not show that the reported USD prices controlled the amount actually paid by the purchaser.  Appx42.  Habaş admits that

it was "not able to report the date of the receipt of payment on a transaction-specific basis because its information system does not link payments to invoices." Appx42 (quoting Appx1628). Without the transaction-specific payment date and associated exchange rate, Commerce could not confirm the dollar value actually paid. Appx42; Appx10-11.[6]

> ### 3. Available Payment Information In Dollars Did Not Align With The Dollar-Denominated Unit Price On The Invoice

Finally, Habaş's sample sale showed that the payment price had no connection to the USD price on the invoice. Appx42. As Commerce explained, the USD payment data for the sample sale did not match the USD price on the invoice. Appx42. The domestic producers "demonstrated that the payment amount apparently has no connection with the USD price and quantity shown on the invoice." Appx42 (citing Appx3088; Appx1350-1360).

Using the example from Habaş's sample home market sale, the domestic producers compared the dollar-denominated unit price on the invoice with the amount reported on the payment documentation. Appx3087-3088 (citing, *e.g.*, Appx1353 (documentation regarding the sample sale in Exhibit A-8)). Based on

---

[6] Habaş failed to provide payment information even after Commerce issued a supplemental questionnaire requesting additional information for certain home market sales during August 2018. Appx42; Appx3108 (supplemental A-C questionnaire). Instead of providing payment dates, Habaş provided further calculations regarding "the average age of receivables," and "correct{ed} an error for the calculation of the payment dates" for that customer. Appx1896.

CONFIDENTIAL MATERIAL OMITTED

the quantity of the sale [ number ] metric tons, the dollar-denominated unit price of [number ] per metric ton, and the value added tax of [ # ] percent, the price should have totaled [ number ]. Appx3088 (citing Appx1353). Yet, the payment amount was [ number ], which appeared nowhere on the invoice. Appx3088 (citing Appx1353, Appx1360). As Commerce explained, this payment amount "does not equal USD price times quantity, or . . . USD price times quantity plus tax." Appx42.

On appeal, Habaş nonetheless relies on the invoice and payment documentation associated with its sample sale. Applnt. Br. at 21, 27-28 (citing Appx1350-1360). According to Habaş, "the payment screenshot provided by Habaş clearly demonstrates that {the payment amount} is recorded in USD." Applnt. Br. at 23-24 (citing, *e.g.*, Appx1360). But that does not show that the dollar-denominated unit price on the invoice "control{led} the ultimate amount paid," as Habaş contends. *Id.* at 21. Instead, the sample sale shows the opposite because the amount paid ([ number ]) does not match any value on the invoice. *See* Appx42 (citing Appx3088, Appx1353, Appx1360).

Habaş attempts to address the discrepancy by stating that payments "do not match to individual invoice amounts." Applnt. Br. at 24 (citing, *e.g.*, Appx1628, Appx1350-1360, Appx1285). This argument is irrelevant. Regardless of the

reason why, the record does not show that the USD price on the invoice matched—much less controlled—the ultimate amount paid.

Habaş argues that both Commerce and the trial court failed to account for "factual evidence on the record supporting the use of the reported USD amounts." Applnt. Br. at 24-25 (citing, e.g., *Ceramark Tech., Inc. v. United States*, 11 F. Supp. 3d 1317, 1323 (Ct. Int'l Trade 2014)).  But even assuming Habaş could show that an inconsistent conclusion could be drawn from the record, that would "not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo*, 383 U.S. at 619–20; *Armstrong Bros. Tool Co. v. United States*, 626 F.2d 168, 170 & n. 3 (1980); *see also SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 840 (Fed. Cir. 2020) (quoting *Downhole Pipe*, 776 F.3d at 1374) (explaining the substantial evidence standard).  Based on the record evidence, a reasonable mind could conclude "that the USD-denominated price shown on the invoice has no connection with the ultimate payment and thus, the {lira}-denominated price on the invoice is the final price."  Appx42-43.

### B.    Commerce's Methodology Was Reasonable And Accords With Its Approach In Past Proceedings

Not only are Commerce's findings supported by the record, but its use of the lira-denominated prices accords with its approach in prior proceedings to use the final price controlling the amount ultimately paid.  For example, in the first administrative review of the same antidumping duty order at issue in this case,

Commerce used the dollar-denominated price when (among other considerations) the dollar "price control{ed} the ultimate amount that the purchaser {paid} for the sale." *2016-17 HRS Review*, 84 Fed. Reg. 30,694, and IDM at cmt. 2. Commerce explained that that the respondent (Colakoglu) and its customers negotiated the home market sales in dollars and "these prices *did not change* once an agreement was reached." *Id.* (emphasis added).[7] In this proceeding, similarly, Commerce used the price that controlled the "final price" of the home market sales. Appx42-43.

Habaş nonetheless claims that Commerce irrationally departed "from its own precedent" in the first administrative review. *See, e.g.*, Applnt. Br. at 10 (quoting *Nakornthai Strip Mill Pub. Co. v. United States*, 587 F. Supp. 2d 1303, 1308 (Ct. Int'l Trade 2008)); *id.* at 13 (quoting *2016-17 HRS Final Results* IDM at 10). But there is no departure. In this proceeding, as in the first administrative review, Commerce used the price that controlled the "final price" of the home market sales. Appx42-43. The difference is that, based on the record in this review, Commerce found that Habaş's lira-denominated price controlled the "final price"

---

[7] As another example, dollar prices were appropriate when "the Turkish lira prices shown on the invoices were not the final prices between the parties, but instead represented estimates of what {the respondent} believed would be the final lira amount at the time of payment." *Certain Steel Concrete Reinforcing Bars From Turkey; Final Results of Antidumping Duty Administrative Review*, 66 Fed. Reg. 56,274 (Nov. 7, 2001), and accompanying IDM at cmt. 4.

of the home market sales.  Appx42-43.  "{E}ach administrative review is a

separate exercise of Commerce's authority that allows for different conclusions

based on different facts in the record," *Qingdao Sea-Line Trading Co. v. United

States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014), and, here, Commerce's finding is

supported by substantial record evidence, *see* Section III.A.

Habaş also claims that Commerce departed from the preliminary results

from the second administrative review of the same antidumping duty order.

Applnt. Br. at 15 (citing *Certain Hot-Rolled Steel Flat Products from Turkey,

Preliminary Results of Antidumping Duty Administrative Review and Preliminary

Determination of No Shipments; 2017-2018*, 84 Fed. Reg. 68,878 (Dep't

Commerce Dec. 17, 2019), and accompanying PDM at 15).  But that review was

discontinued with respect to Colakoglu, the sole mandatory respondent.  *Certain

Hot-Rolled Steel Flat Products from Turkey: Final Results of Antidumping Duty

Administrative Review and Final Determination of No Shipments; 2017-2018*, 85

Fed. Reg. 63,098 (Dep't Commerce Oct. 6, 2020).  Accordingly, the preliminary

results are "just that"—preliminary—and were not adopted in any final decision.

*See Changshan Peer Bearing Co., Ltd. v. United States*, 953 F. Supp. 2d 1354,

1363 (Ct. Int'l Trade 2014).  These preliminary results provide no basis for second-

guessing Commerce's reasoning in this proceeding.

Nor is there any conflict between this proceeding and Commerce's final determination in its investigation of cold-rolled steel flat products from Turkey. *See* Applnt. Br. at 16-17 (citing *Certain Cold-Rolled Carbon Steel Flat Products From Turkey: Notice of Final Determination of Sales at Less Than Fair Value* (*CRS from Turkey*), 67 Fed. Reg. 62,126 (Dep't Commerce Oct. 3, 2002) (final determ.), and accompanying IDM at 2). In that determination, Commerce used USD prices when sales were agreed upon in dollars and these prices generally "*did not change* once the agreement was reached{.}" *CRS from Turkey*, 67 Fed. Reg. 62,126, and accompanying IDM at cmt. 1 (emphasis added). The lira-denominated prices in that proceeding "were not the final prices between the parties." *Id.* Habaş cannot show that the same is true here. To the contrary, Commerce found that the dollar-denominated price on the invoice had "no connection with the ultimate payment," and that the lira-denominated price was the "final price." Appx42-43.

Finally, Habaş claims that like the respondents in prior proceedings, its home market sales were negotiated, confirmed, and paid in dollars. Applnt. Br. at 15-16 (citing Appx1350-1360; Appx1631); *see also id.* at 17; *id.* at 20 (quoting Appx1285); *id.* at 21 (citing, *e.g.*, Appx1350-1360). Even taking those claims as true, however, Habaş cannot show that the final price paid is *the same as* the USD price that was purportedly negotiated. Appx42-43. Habaş admits that

Commerce's practice is to use the currency that "controls the ultimate amount a purchaser pays for the sale." Applnt. Br. at 12. In this proceeding, Commerce acted consistently with that practice by using the lira-denominated price that controlled the "final price" paid for Habaş's home market sales. Appx42-43.

C.    Habaş's Arguments Regarding The "Transaction Currency" Are Unpersuasive

Finally, Habaş's repeated references to the "transaction currency" provide no basis for disturbing the trial court's or Commerce's decisions. Habaş argues that the dollar—not the lira—was the "transaction currency." Applnt. Br. at 12. Yet, Habaş fails to explain how its use of the term "transaction currency" relates to Commerce's authority under the statute or regulations or Commerce's past practices in prior proceedings. The answer is that it does not. Commerce accurately explained that "the term 'transaction currency' is not defined by the Act or Commerce's regulation or used in the {antidumping duty} questionnaire." Appx41.

Habaş also cites a policy bulletin regarding imputed credit expenses to support its argument regarding the "transaction currency." Applnt. Br. at 12 (citing Import Administration Policy Bulletin 98.2: Imputed credit expenses and interest rates (Feb. 23, 1998), available at https://enforcement.trade.gov/policy/bull98-2.htm). The cited policy bulletin discusses Commerce's practice to "use a short-term interest rate tied to the currency in which the sales are denominated" when

"calculating imputed credit expenses." *Id*. Nothing in the policy bulletin,

however, dictates how to assess the currency in which home market sales are

denominated. Import Administration Policy Bulletin 98.2: Imputed credit

expenses and interest rates (Feb. 23, 1998), available at

https://enforcement.trade.gov/policy/bull98-2.htm. Nor does the policy bulletin

otherwise conflict with Commerce's decision in this proceeding to use the lira-

denominated prices that reflect the "final price" for the transaction and reconcile to

Habaş's financial statements. *See id.*; Appx41-43. Thus, Habaş's repeated

reference to the "transaction currency" provides no basis for disturbing

Commerce's reasoning in this proceeding.

Relatedly, Habaş argues that Commerce's reasoning departs from its

"practice" to "rely upon the currency in which a sale was earned or incurred."

Applnt. Br. at 12, 18. But Commerce's use of the "final" price paid by the

purchaser—the lira-denominated price—does not conflict with its instruction for

respondents to report the currency in which the sale was earned. *See* Appx42-43

(explaining that the lira-denominated price is the "final price"); *see also* Appx1152

(questionnaire instructions). Habaş nonetheless claims that Commerce departed

from prior practice by stating that "the currency in which the sales are 'incurred' is

not the sole determining factor." Applnt. Br. at 19-20 (citing Appx41). This

reflects no departure, however, but simply highlights the multiple considerations in

weighing record evidence—including the importance of using only reliable evidence that can be reconciled with a company's accounting records.  Appx40-41 (citing *Stainless Steel Flanges*, 83 Fed. Reg. 13,244, and accompanying PDM at 9).  Habaş fails to show that Commerce's use of the "final price" for the home market sales diverges from the general instruction to report prices in the currency in which they are earned.  *See* Appx41-43.

Habaş also suggests that Commerce departed from its prior practice to rely on the currency "as reported in the respondent's books and records to calculate normal value."  Applnt. Br. at 18-19 (citing, *e.g.*, 19 U.S.C. § 1677b(f)(1)(A)).  This argument is confusing.  It is unclear how Commerce failed to rely on Habaş's "books and records," *see id.*, when Commerce used the lira-denominated prices provided by Habaş, which reconciled with Habaş's own accounting records, Appx40-43.[8]

IV.  **Using Lira-Denominated Prices Creates No Absurd Results When Those Prices Represent The Final Prices For Habaş's Home Market Sales**

Finally, contrary to Habaş's arguments on appeal, Commerce's use of the lira-denominated prices created no "absurd results."  *See* Applnt. Br. at 25-30.

---

[8]  Indeed, the Court of International Trade has previously sustained Commerce's decision to use lira-denominated costs from a respondent's "accounting records to conduct a threshold analysis of quarterly costs."  Appx41 (citing *Eregli Demir ve Celik Fabrikalari T.A.S. v. United States*, 308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018)).

Habaş argues that Commerce was required to use dollar-denominated prices "{t}o combat the volatile exchange rate." Applnt. Br. at 25. But this argument disregards that the lira-denominated prices—not the USD prices—were the final prices for Habaş's home market sales. *See* Appx42-43. Thus, using these prices creates no absurd results.

Once these final prices are established, moreover, Commerce is statutorily required to "convert foreign currencies into United States dollars using the exchange rate in effect on the date of sale of the subject merchandise." Appx43; 19 U.S.C. § 1677b-1(a) (listing certain exceptions not relevant here). Because all U.S. sales were made on August 2, 2018, Commerce used the exchange rate in effect on that date, certified by the Federal Reserve Bank. Appx43; 19 U.S.C. § 1677b-1(a); 19 C.F.R. § 351.415.

Habaş relies on a prior Commerce decision stating that "*if* the prices are fixed differently for those who pay in USD versus {lira}, *then* the USD prices for sales negotiated in USD should be used to ensure capturing the real value for those sales." Applnt. Br. at 25 (quoting *CRS from Turkey*, 67 Fed. Reg. 62,126, and accompanying IDM at 5) (emphasis added); *see also id.* at 16. But the condition precedent—that prices are "fixed" in dollars—is not satisfied here. Appx42-43. Instead, the dollar-denominated price had "no connection with the ultimate payment." Appx42.

Habaş next claims that using the lira-denominated prices "introduces an extraordinary distortion to the margin calculation." Applnt. Br. at 29. According to Habaş, "the Turkish currency fluctuates often and widely," and "the month of the U.S. sale, August 2018, witnessed an aberrational and unique devaluation of the Turkish currency{.}" *Id.* Habaş states that "Turkish producers denominate transactions in U.S. Dollars" to "avoid the exchange rate fluctuation risks." *Id.* at 30. In this case, however, the final price for the home market sales was *not* the dollar-denominated price on the invoice, but rather the invoiced price in lira. Appx42-43. Based on that final price, Commerce reasonably used the statutorily required exchange rate on August 2, 2018. Appx43.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the judgment of the Court of International Trade.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:

Alexander Fried
Attorney
Office of the Chief Counsel
  For Trade Enforcement & Compliance
U.S. Department of Commerce


Dated: February 26, 2024

/s/ Emma E. Bond
EMMA E. BOND
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 353-2034
Email: emma.e.bond@usdoj.gov

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7) and Federal Circuit Rule 32(b), the undersigned certifies that the word processing software used to prepare this brief indicates there are no more than 6,955 words, excluding the portions of the brief identified in the rules.  The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

<u>/s/Emma E. Bond</u>